# No. 18-1691

_____

## IN THE U.S. COURT OF APPEALS
## FOR THE SECOND CIRCUIT
_____

Knight First Amendment Institute at Columbia University,
Rebecca Buckwalter, Phillip Cohen, Holly Figueroa, Eugene Gu,
Brandon Neely, Joseph Papp, and Nicholas Pappas,

*Plaintiffs-Appellees*,

v.

Donald J. Trump, President of the United States, and Daniel Scavino,
White House Director of Social Media and Assistant to the President,

*Defendants-Appellants*,

Sarah Huckabee Sanders, White House Press Secretary,

*Defendant*.

_____
_____

On Appeal from the U.S. District Court
for the Southern District of New York
_____

## BRIEF OF AMICUS COOLIDGE-REAGAN
## FOUNDATION IN SUPPORT OF DEFENDANTS-APPELLANTS
_____

Dan Backer
POLITICAL.LAW PLLC
441 N. Lee Street, Suite 300
Alexandria, VA 22314
(202) 210-5431
dan@political.law
*Counsel for Amicus Coolidge-
Reagan Foundation*
*Application for admission
pending

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Amicus Coolidge-Reagan Foundation has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....................................................i

TABLE OF AUTHORITIES .................................................................iv

INTERESTS OF AMICUS CURIAE
COOLIDGE-REAGAN FOUNDATION ...........................................................1

ARGUMENT .................................................................................1

I.   THE DISTRICT COURT SHOULD NOT HAVE ADJUDICATED
     THE KNIGHT FIRST AMENDMENT INSTITUTE'S CLAIMS..............1

     A.   The Institute Lacks Standing.....................................................2

     B.   The Court's Judgment in Favor of the Individual
          Plaintiffs Was Sufficient to Moot the Institute's Claim....................6

     C.   The Court Abused Its Discretion Under the Declaratory
          Judgment Act By Adjudicating the Institute's Claims.......................8

II.  THE DISTRICT COURT'S HOLDING THAT PRESIDENT
     TRUMP'S TWITTER ACCOUNT BECAME A GOVERNMENT
     FORUM CREATES UNACKNOWLEDGED DIFFICULTIES
     IN OTHER AREAS OF LAW ..................................................13

III. THE DISTRICT COURT ERRED IN CONCLUDING
     PRESIDENT TRUMP'S TWITTER ACCOUNT IS A
     DESIGNATED PUBLIC FORUM .........................................20

     A.   The District Court's Ruling Improperly
          Allows the Blocked Users to Hijack and Reap
          the Benefits of President Trump's Follower List............................21

     B.   The Use of President Trump's Follower List is Effectively
          a Subsidy the President May Selectively Withhold from
          the Blocked Users on Viewpoint-based Grounds ...........................23

IV.  THE DISTRICT COURT'S ANALYSIS OF PRESIDENT TRUMP'S INTENT IS INTERNALLY CONTRADICTORY ................. 24

CONCLUSION .................................................................................................. 27

CERTIFICATE OF COMPLIANCE .................................................................. 28

CERTIFICATE OF SERVICE ........................................................................... 29

# TABLE OF AUTHORITIES

**Cases**

*ASARCO, Inc. v. Kadish*,
490 U.S. 605 (1989)......................................................................................5

*Calash v. Bridgeport*,
788 F.2d 80 (1986) ......................................................................................25

*Camreta v. Greene*,
131 S. Ct. 2020 (2011).................................................................................11

*Carter/Mondale Pres. Comm., Inc. v. FEC*,
775 F.2d 1182 (D.C. Cir. 1985)...................................................................16

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
868 F.3d 104 (2d Cir. 2017) .........................................................................2

*Common Cause v. FEC*,
842 F.2d 431 (D.C. Cir. 1988)....................................................................15

*Cornelius v. NAACP Legal Def. & Educ. Fund*,
473 U.S. 788 (1985)....................................................................................25

*Crane v. Poetic Prods.*,
351 F. App'x 516 (2d Cir. 2009)..................................................................13

*Davis v. FEC*,
554 U.S. 724 (2008).....................................................................................19

*Democratic Cong. Campaign Comm. v. FEC*,
831 F.2d 1131 (D.C. Cir. 1987)...................................................................15

*Dow Jones & Co., Inc. v. Harrods Ltd.*,
346 F.3d 357 (2d Cir. 2003) ...................................................................9, 13

*FTC v. A.P.W. Paper Co.*,
328 U.S. 193 (1946)....................................................................................22

*Green Party of Conn. v. Garfield*,
616 F.3d 213 (2d Cir. 2010) .......................................................................... 19

*Hotel Employees & Restaurant Employees Union 100 v.*
*City of New York Dep't of Parks and Recreation*,
311 F.3d 534 (2d Cir. 2002) .......................................................................... 26

*Hustler Mag. v. Falwell*,
485 U.S. 46 (1988)......................................................................................... 19

In re *Application of Dow Jones & Co.*,
842 F.2d 603 (2d Cir. 1988) ............................................................................ 6

*Int'l News Serv. v. Assoc. Press*,
248 U.S. 215 (1918).................................................................................. 21, 22

*Kleindienst v. Mandel*,
408 U.S. 753 (1972)..................................................................................... 3, 4

*Knight First Amend. Inst. v. Trump*,
302 F. Supp. 3d 541 (S.D.N.Y. 2018) .................................................*passim*

*Lamont v. Postmaster Gen.*,
381 U.S. 301 (1965).......................................................................................... 3

*Lebron v AMTRAK*,
69 F.3d 650 (2d Cir. 1995) ............................................................................ 26

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992).................................................................................... 2, 5

*Nnebe v. Daus*,
644 F.3d 147 (2d Cir. 2011) ............................................................................ 2

*NRA v. FEC*,
854 F.2d 1330 (D.C. Cir. 1988)..............................................................15-16

*Orion Pics. Corp. v. Showtime Networks*,
4 F.3d 1095 (2d Cir. 1993) .............................................................................. 9

*Paulsen v. Cnty. of Nassau*,
     925 F.2d 65 (2d Cir. 1991) ....................................................................... 25

*Pleasant Grove City v. Summum*,
     555 U.S. 460 (2009).............................................................................24-25

*Rust v. Sullivan*,
     500 U.S. 173 (1991)............................................................................23, 24

*S.p.A. v. Necchi Sewing Mach. Sales Corp.*,
     348 F.2d 693 (2d Cir. 1965) ....................................................................... 13

*San Francisco Arts & Athletics, Inc. ("SFAA") v. U.S. Olympic Comm.*,
     483 U.S. 522 (1987).....................................................................21, 22, 23

*Simon v. E. Ky. Welfare Rights Org.*,
     426 U.S. 26 (1976)..................................................................................... 2

*Smith v. Metro. Prop. & Liab. Ins. Co.*,
     629 F.2d 757 (2d Cir. 1980) ....................................................................... 13

*Taylor v. Sturgell*,
     553 U.S. 880 (2008).............................................................................10-11

*Trump v. Hawaii*,
     138 S. Ct. 2392 (2018).............................................................................. 10

*United States v. Mendoza*,
     464 U.S. 154 (1984).......................................................................11, 12, 13

*United States v. Simon*,
     664 F. Supp. 780 (S.D.N.Y. 1987) .............................................................6, 9

*United We Stand Am., Inc. v. United We Stand, Am. N.Y., Inc.*,
     128 F.3d 86 (2d Cir. 1997) .....................................................................22-23

*Westmoreland v. CBS*,
     752 F.2d 16 (2d Cir. 1984) ......................................................................... 4

*Wilton v. Seven Falls Co.*,
515 U.S. 277 (1995).................................................................................. 8

*WJW-TV, Inc. v. City of Cleveland*,
878 F.2d 906 (6th Cir. 1989) ................................................................... 7

*Zacchini v. Scripps-Howard Broad. Co.*,
433 U.S. 562 (1977)........................................................................21-22

*Ziemba v. Rell*,
409 F.3d 553 (2d Cir. 2005) .................................................................... 6

## **Statutes**

5 U.S.C. § 7323 ...................................................................................... 18

11 C.F.R. § 110.11 .................................................................................. 14

28 U.S.C. § 2201 ....................................................................................... 8

44 U.S.C. § 3301 ..................................................................................... 18

44 U.S.C. § 3303 ..................................................................................... 18

52 U.S.C. § 30109 ................................................................................... 15

52 U.S.C. § 30120 ................................................................................... 14

Fed. R. App. P. 29 ..................................................................................... 1

Fed. R. Civ. P. 4 ...................................................................................... 10

Fed. R. Civ. P. 23 ................................................................................ 11, 12

## Other Authorities and Sources

Samuel L. Bray, *Multiple Chancellors:*
*Reforming the National Injunction*,
131 HARV. L. REV. 418 (2017) ............................................................. 11, 12

Aaron-Andrew P. Bruhl, *One Good Plaintiff is Not Enough*,
67 DUKE L.J. 481 (2017) ........................................................................ 2

FEC, "First General Counsel's Report," *In re Frankel*,
MUR 6911 (Sept. 4, 2015) ...............................................................14-15

FEC, *Great America PAC*, A.O. 2017-05 (Sept. 20, 2017)................................. 16

FEC, *In re Frankel*, MUR 6911 (Dec. 4, 2014) ..................................................... 14

FEC, *Internet Communication Disclaimers; Reopening*
*of Comment Period and Notice of Hearing*
81 FED. REG. 71,647 (Oct. 18, 2016)........................................................ 17

FEC, *Internet Communication Disclaimers; Reopening*
*of Comment Period and Notice of Hearing*,
82 FED. REG. 46,937 (Oct. 10, 2017)........................................................ 17

FEC, Notice of Proposed Rulemaking, *Internet Communication*
*Disclaimers and Definition of "Public Communication*,"
83 FED. REG. 12,864 (Mar. 26, 2018)........................................................ 17

HOUSE COMM. ON STANDARDS OF OFFICIAL CONDUCT,
HOUSE ETHICS MANUAL (2008).................................................................. 18

Letter from FEC Ass't Gen. Counsel Mark Allen to
Brian G. Svobada, Esq. & Andrew H. Werbrock, Esq.,
MUR 6911 (Mar. 3, 2016)......................................................................... 15

Michael T. Morley, *De Facto Class Actions? Plaintiff- and*
*Defendant-Oriented Injunctions in Voting Rights,*
*Election Law, and Other Constitutional Cases*,
39 HARV. J. L. & PUB. POL'Y 487 (2016) ............................................. 10, 12

Chairman Matthew S. Petersen and Comm'rs Lee E.
Goodman and Caroline C. Hunter, "Statement of Reasons,"
MUR 6911 (Apr. 12, 2016) ........................................................ 16

SENATE ETHICS COMM., SENATE ETHICS MANUAL,
S. Pub. 108-1 (2003) .............................................................. 18

https://twitter.com/realDonaldTrump ...........................................20-21

**INTERESTS OF AMICUS CURIAE COOLIDGE-REAGAN FOUNDATION**

Amicus Coolidge-Reagan Foundation ("CRF") is a non-profit charitable organization formed under § 501(c)(3) of the Internal Revenue Code.[1] Its mission is to defend, protect, and advance liberty, particularly including the First Amendment right to freedom of speech. CRF presents this brief because it believes the district court has misconstrued the First Amendment in this case, and its ruling could have problematic consequences for other areas of law. CRF's President, undersigned counsel Dan Backer, has authorized it to file this brief.

**ARGUMENT**

**I.    THE DISTRICT COURT SHOULD NOT HAVE ADJUDICATED THE KNIGHT FIRST AMENDMENT INSTITUTE'S CLAIMS**

The district court erred by adjudicating the Institute's claims because the Institute lacked standing to complain of the President's decision to block the individual, non-institutional plaintiffs (hereafter, "Blocked Users") from Twitter. Moreover, the district court's ruling in favor of the Blocked Users mooted the Institute's claims, resolving its Article III case or controversy against the Government. Finally, given the tremendously different legal consequences between

---

[1] No party's counsel has authorized this brief in whole or part. No party or party's counsel has contributed money intended to fund the preparation or submission of this brief. No person, other than CRF, its members, or its counsel, contributed money intended to fund preparation or submission of the brief. *See* FED. R. APP. P. 29(a)(4)(E)(i)-(iii).

ruling in favor of the Blocked Users and ruling in favor of the Institute, the court should have exercised its discretion to refrain from issuing a declaratory judgment in favor of the Institute. This Court should consider these jurisdictional issues because, as discussed in Section I.C below, the Institute's continued presence as a party plays an important role in determining the scope of the judgment in this case. *See* Aaron-Andrew P. Bruhl, *One Good Plaintiff is Not Enough*, 67 DUKE L.J. 481, 506-11, 542-43 (2017).

## A. <u>The Institute Lacks Standing</u>

As an initial matter, the Institute lacks standing because its harm was not caused by the Appellants, but rather the Blocked Users. To have standing, a plaintiff must demonstrate the existence of an individualized and concrete injury-in-fact, that injury must be caused by the defendants, and a favorable judgment must redress that injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). These requirements apply to an organization such as the Institute asserting its own institutional interests. *See Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017) (quoting *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011)). The Institute cannot satisfy these requirements because its alleged injury "results from the independent action of some third party not before the court" as a defendant, the Blocked Users, rather than "the challenged action of the defendant." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976).

The Institute's alleged injury-in-fact is that it cannot read the comments the Blocked Users would have posted in response to President Trump's Tweets if they had not been blocked. *Knight First Amend. Inst. v. Trump*, 302 F. Supp. 3d 541, 563 (S.D.N.Y. 2018). The court held the defendants caused this injury because it is "a direct consequence of the individual plaintiffs being unable to reply directly to the President's tweets, which is, in turn, a direct consequence of the individual plaintiffs having been blocked." *Id*. at 564.

The facts of this case do not support the district court's reasoning. The Institute is, in effect, asserting its First Amendment right to receive information from the Blocked Users. *See Lamont v. Postmaster Gen.*, 381 U.S. 301, 305-06 (1965). It is attempting to rely on the type of standing argument asserted by the plaintiffs in *Kleindienst v. Mandel*, 408 U.S. 753, 756 (1972), American scholars and students who had invited a Belgian citizen to attend an academic meeting in the United States. The Government had denied the Belgian's request for a visa because he was inadmissible under federal law and the Attorney General refused to waive the bar. *Id*. at 759. The U.S. Supreme Court held that, although the Belgian did not personally have a right to enter the United States, the Americans who had invited him had standing to assert a First Amendment right to listen to him speak and receive information from him. *Id*. at 763-64.

The *Kleindienst* Court rejected the Government's arguments that the Americans already had "free access to [his] ideas through his books and speeches," and "'technological developments,' such as tapes or telephone hook-ups, readily supplant his physical presence." *Id*. at 765. The Court explained, "This argument overlooks what may be particular qualities inherent in sustained, face-to-face debate, discussion and questioning." *Id*. Thus, the "existence of other alternative[s]" means of communicating did not "extinguish[] altogether" the American scholars' standing to assert a First Amendment challenge to the Belgian's exclusion. *See also Westmoreland v. CBS*, 752 F.2d 16, 22 (2d Cir. 1984) ("[T]he public's right to receive information may not be vitiated by the availability of alternative means for receipt of the information.").

This case, however, differs materially from precedents such as *Kleindienst* in which courts recognized litigants' standing to assert right-to-receive-information claims. The Government here is not interfering with the Institute's ability to receive the information is seeks from the Blocked Users through the precise medium the Institute wishes, Twitter. It is undisputed the Blocked Users may "view tweets from @realDonaldTrump" without logging into their own accounts. *KFAI*, 302 F. Supp. 3d at 554. And it is likewise undisputed the Blocked Users may tweet whatever they wish, including responses or reactions to tweets from the @realDonaldTrump account, from their own Twitter accounts. *Id*. In other words, while being blocked

4

from the @realDonaldTrump account prevents the Blocked Users from disseminating tweets in direct reply to tweets from @realDonaldTrump, they may disseminate the exact same tweets containing the exact same content directly from their own accounts.[2] If the Institute chose to follow the Blocked Users, it would automatically receive those tweets in its Twitter feed.

Thus, Appellants' challenged actions do not prevent the Institute from receiving information from the Blocked Users through the medium the Institute wishes: tweets from the Blocked Users, automatically conveyed directly to the Institute's Twitter feed. To the extent the Institute is receiving less information from the Blocked Users, it is not because of Appellants' actions. Rather, the Institute's alleged organizational injury is the result of: (i) the Blocked Users' "unfettered choice[]" to refrain from communicating their views by tweeting them directly from their own Twitter accounts, which they remain entirely free to do, and (ii) the Institute's independent refusal to follow most of the Blocked Users on Twitter.[3] *Lujan*, 504 U.S. at 562 (quoting *ASARCO, Inc. v. Kadish*, 490 U.S. 605, 615 (1989)

---

[2] In fact, the Blocked Users may even capture images or screenshots of President Trump's tweets without logging into their accounts and then, upon logging in, include those images in their own tweets commenting on the President's statements.

[3] Indeed, the Institute's desire to receive information from the Blocked Users is highly questionable, given that the Institute has chosen to follow only one of them on Twitter. *KFAI*, 302 F. Supp. 3d at 563 ("[T]he Knight Institute did not follow on Twitter six of the seven individual plaintiffs' accounts . . . .").

(opinion of Kennedy, J.)); *cf. Ziemba v. Rell*, 409 F.3d 553, 555 (2d Cir. 2005). Thus, the Institute lacks standing to challenge Appellants' actions due to lack of causation.

**B.  The Court's Judgment in Favor of the Individual Plaintiffs Was Sufficient to Moot the Institute's Claim**

Even assuming Appellants' decision to block the Blocked Users caused the Institute injury-in-fact, any such harm is completely alleviated by the district court's declaratory judgment in favor of the Blocked Users. The district court itself observed, "[B]ecause all government officials are presumed to follow the law once the judiciary has said what the law is, we must assume that the President and [Assistant to the President] Scavino will remedy the blocking we have held to be unconstitutional." *KFAI*, 302 F. Supp. 3d at 580. Consequently, the court's declaratory judgment in favor of the Blocked Users was sufficient to alleviate the Institute's alleged injury, thereby mooting its claims against the Government.  The district court erred by nevertheless entering a declaratory judgment in the Institute's favor.

As noted above, the Institute claims the President's actions infringed its right to receive information from the Blocked Users. As such, its claim is derivative of the Blocked User's First Amendment right to freedom of speech. *See United States v. Simon*, 664 F. Supp. 780, 786 (S.D.N.Y. 1987) ("[T]he potential recipient's rights are entirely derivative of those of the speaker."), *aff'd sub nom.* In re *Application of Dow Jones & Co.*, 842 F.2d 603, 607 (2d Cir. 1988). Because the district court's

declaratory judgment in favor of the Blocked Users is presumed to remove the alleged impediment to their expression, *KFAI*, 302 F. Supp. 3d at 580, it concomitantly alleviates the alleged infringement of the Institute's rights.

This case bears some similarity to *WJW-TV, Inc. v. City of Cleveland*, 878 F.2d 906 (6th Cir. 1989). There, plaintiff reporters had sued the Mayor of Cleveland and various city councilmembers in federal district court, alleging they violated the First Amendment by preventing the plaintiffs from witnessing an informal meeting. *Id*. at 907. The district ruled in favor of the reporters, and the local government defendants appealed. *Id*. While the appeal was pending, the Ohio Supreme Court held, in a separate challenge brought by different plaintiffs arising from the same incident, the local government defendants' actions violated state law. *Id*. at 908-09. The Sixth Circuit held the Ohio Supreme Court's ruling mooted the plaintiff reporters' First Amendment claim, since it guaranteed them access to the information they sought: conversations among the local government defendants at any informal meetings. *Id*. at 910.

Likewise, here, the district court's declaratory judgment in favor of the Blocked Users was deemed sufficient to ensure their unblocking, thereby alleviating the ongoing and future injury of which the Institute complained. *KFAI*, 302 F. Supp. 3d at 580. Thus, any justiciable controversy between the Institute and the

7

Government evaporated, and the district court should not have gone on to enter a declaratory judgment in the Institute's favor.

### C. The Court Abused Its Discretion Under the Declaratory Judgment Act By Adjudicating the Institute's Claims

Even if the Institute presented a justiciable controversy, the district court abused its discretion under the circumstances of this case by exercising jurisdiction over its claim for a declaratory judgment. The Declaratory Judgment Act, 28 U.S.C. § 2201, "confer[s] on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants. . . . [T]he normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286-88 (1995).

This Court has identified five factors a district court must weigh in deciding whether to entertain a declaratory judgment claim:

(i) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved;

(ii) whether a judgment would finalize the controversy and offer relief from uncertainty;

(iii) whether the proposed remedy is being used merely for procedural fencing or a race to res judicata;

(iv) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and

(v)     whether there is a better or more effective remedy.

*Dow Jones & Co., Inc. v. Harrods Ltd.*, 346 F.3d 357, 359-60 (2d Cir. 2003). These factors counsel strongly against the district court's decision to adjudicate the Institute's declaratory judgment claim.

First, as discussed above, the declaratory judgment in favor of the Institute served no "useful purpose in clarifying or settling the legal issues involved," because they had already been resolved though the district court's adjudication of the Blocked Users' claims. *Id*. As explained above, the Institute's alleged right to receive information is merely derivative of the Blocked Users' claimed First Amendment right to communicate freely in a public forum. *Simon*, 664 F. Supp. at 786. A district court may properly refrain from issuing a declaratory judgment when the underlying issues are already resolved in other, more direct proceedings. *Cf. Orion Pics. Corp. v. Showtime Networks*, 4 F.3d 1095, 1100 (2d Cir. 1993) ("Where a district court has before it a declaratory judgment action and a direct action containing all of the issues in the declaratory judgment action, and decides the common issues in the direct action, it may exercise its discretion to dismiss the declaratory judgment complaint."). Second, for the same reason, a declaratory judgment for the Institute was unnecessary to resolve any controversy with Appellants or "offer relief from uncertainty." *Dow Jones & Co.*, 346 F.3d at 359.

9

Considering the third and fourth prongs together, the Institute's declaratory judgment claim does not involve "procedural fencing," a "race to *res judicata*" or "friction between sovereign legal systems" in the usual sense of those terms. There is a substantial likelihood, however, that the judgment allows the Institute, through collateral estoppel, to prevent the President—and potentially any subordinate federal agency or official—from blocking any Twitter user anywhere in the nation or perhaps even the world. The Institute's declaratory judgment is, in effect, the equivalent of a backdoor nationwide injunction, raising most of the same deeply troubling concerns about *res judicata* and intrusion into other circuits' prerogatives such orders implicate. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2429 (2018) (Thomas, J., concurring); *see also* Michael T. Morley, *De Facto Class Actions? Plaintiff- and Defendant-Oriented Injunctions in Voting Rights, Election Law, and Other Constitutional Cases*, 39 HARV. J. L. & PUB. POL'Y 487, 544-46 (2016) (recognizing plaintiff entities asserting organizational standing may seek nationwide Defendant-Oriented Injunctions completely barring a government defendant from enforcing a challenged policy or decision against any rightholder, anywhere in the nation).

Congress structured the federal judicial system to be hierarchical and decentralized, with lower court judges exercising limited power. The U.S. District Court for the Southern District of New York generally has jurisdiction only over a small fraction of the American population. *See* Fed. R. Civ. P. 4(k). Its judgments

typically do not carry any *res judicata* effect for third-party non-litigants. *See Taylor v. Sturgell*, 553 U.S. 880 (2008). Its opinions lack the force of law in any other judicial district (and, indeed, even lack *stare decisis* effect within the Southern District itself). *See Camreta v. Greene*, 131 S. Ct. 2020, 2033 n.7 (2011). The district court's interpretation of the First Amendment and conclusions regarding the Blocked Users' rights do not even preclude the Government from relitigating the same issues against other rightholders in other jurisdictions. *United States v. Mendoza*, 464 U.S. 154, 158-62 (1984) (rejecting the application of nonmutual collateral estoppel against the Government).

For these reasons, a district court's ruling on a controversial constitutional issue generally leaves other districts and circuits free to re-litigate the same issue with regard to rightholders within their respective jurisdictions. *See generally* Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 HARV. L. REV. 418 (2017). This is especially true where a class has not been certified under FED. R. CIV. P. 23(b)(2).

In this case, of course, the district court did not issue any injunction, much less a nationwide injunction. *KFAI*, 302 F. Supp. 3d at 580. A substantial likelihood exists, however, that the Institute's declaratory judgment concerning its right to receive information from Twitter users replying to President Trump's tweets allows it to prevent President Trump (and perhaps subordinate agencies or officials) from

11

blocking anyone in the nation or potentially the world. The Institute may simply assert a desire to read replies from any user blocked by President Trump (and perhaps by any subordinate agency or official) and the Institute's final judgment in this case would collaterally estop the Government from relitigating the issue against the Institute. The Government typically would be free to relitigate the First Amendment issue in this case against other users, and their claims generally would be adjudicated based on the (potentially different) precedents of their respective circuits. *See Mendoza*, 464 U.S. at 154, 159. By exercising jurisdiction over the Institute's organizational standing claim, the district court has likely empowered the Institute to short-circuit such subsequent litigation and give its view of the Constitution the force of law for all rightholders nationwide, without even certifying a class action under Rule 23(b)(2) (which would have at least given the Government the protection of claim preclusion against members of the plaintiff class if it had prevailed, *see* Bray, *supra* at 475-76; Morley, *supra* at 531-34).

Twitter remains a relatively new form of global communication. It plays an important and evolving role in our national political discourse. This case presents several important issues of first impression, most notably the proper application of traditional First Amendment forum analysis to various features of social media. Other jurisdictions should retain the latitude to consider these questions for themselves under the law of their respective circuits. *Cf. Mendoza*, 464 U.S. at 160.

Ultimate Supreme Court review, in turn, would be facilitated by having the opportunity to see the practical consequences of various circuits' approaches. *Id.* This Court's precedents recognize that comity for foreign tribunals, *Crane v. Poetic Prods.*, 351 F. App'x 516, 518 (2d Cir. 2009), and even arbitration, *Smith v. Metro. Prop. & Liab. Ins. Co.*, 629 F.2d 757, 759-60 (2d Cir. 1980) (citing *S.p.A. v. Necchi Sewing Mach. Sales Corp.*, 348 F.2d 693, 696 (2d Cir. 1965)), is a valid basis for declining to entertain declaratory judgment claims. It should extend comparable consideration to the right of other circuits to adjudicate constitutional issues of first impression for themselves. Thus, concerns about res judicata and other circuits weigh very heavily against the exercise of declaratory judgment jurisdiction over the Institute's claims. *Dow Jones & Co.*, 346 F.3d at 359-60.

Finally, a "better . . . remedy" existed to alleviate the alleged harm to the Institute: adjudication of the Blocker Users' claims. *Id.* Thus, the district court abused its discretion and acted contrary to the structure of the federal judicial system by entertaining the Institute's declaratory judgment claim.

## II. THE DISTRICT COURT'S HOLDING THAT PRESIDENT TRUMP'S TWITTER ACCOUNT BECAME A GOVERNMENT FORUM CREATES UNACKNOWLEDGED DIFFICULTIES IN OTHER AREAS OF LAW

The district court's conclusion that the government controls the @realDonaldTrump Twitter account, and it therefore constitutes a governmental forum, *KFAI*, 302 F. Supp. at 566, creates unacknowledged difficulties in other areas

of law. In *In re Frankel*, MUR 6911 (Dec. 4, 2014), the U.S. Federal Election Commission ("FEC") received an administrative complaint alleging several political committees—including the DNC, RNC, and certain congressional candidate committees—violated federal campaign finance law by not including disclaimers with the Tweets they disseminated or on the Twitter homepages associated with their Twitter handles. Federal regulations implementing 52 U.S.C. § 30120 provided "all Internet websites of political committees available to the general public" must "include disclaimers." 11 C.F.R. § 110.11(a)(1).

The First General Counsel's Report prepared for the Commission recommended that the Commission conclude the Tweets and Twitter homepages associated with the respondent committees' Twitter handles did not violate the Commission's regulations. *See* FEC, "First General Counsel's Report," *In re Frankel*, MUR 6911 (Sept. 4, 2015), *at* https://www.fec.gov/files/legal/murs/6911/16044390430.pdf. It declared, "[A] committee creating and posting a Twitter profile is posting that content on a third-party's website and not creating the committee's own website." *Id*. at 5.

The report explained:

Social media website users create their "own" accounts, pages, profiles, or spaces . . . But while Twitter content—including each Respondent's profile—is created by users, it is placed on a single website: Twitter. Twitter, in turn, creates, pays for, and maintains the right to restrict content on that website. . . . Twitter controls the terms by which users may access the website. And Twitter retains its ownership interests in

14

the. website and underlying software, while merely granting users a
license to use that website, software, and other Twitter services.

*Id*. at 4-5 (citing Terms of Service, TWITTER ¶¶ 6-8 (effective May 18, 2015), *at*

https://twitter.com/tos?lang=en (last visited Sept. 3, 2015)). Consequently, the

respondents' Twitter profiles did not "constitute committee websites for purposes of

the disclaimer requirement." *Id*. at 5.

The Committee subsequently deadlocked by a vote of 3-3 on whether reason

to believe the Tweets and Twitter homepages violated federal law. *See* Letter from

FEC Ass't Gen. Counsel Mark Allen to Brian G. Svobada, Esq. & Andrew H.

Werbrock, Esq., MUR 6911 (Mar. 3, 2016), *at*

https://www.fec.gov/files/legal/murs/6911/16044390444.pdf; *see also* 52 U.S.C.

§ 30109(a)(2) (providing the FEC may not commence an investigation as a prelude

to potential enforcement proceedings unless four Commissioners affirmatively

determine there exists reason to believe federal campaign finance law was violated).

When the Commission acts consistently with the General Counsel's report—as

happened as a result of the Commission's deadlock in *Frankel*—that report

constitutes the agency's official rationale.[4] *See NRA v. FEC*, 854 F.2d 1330, 1333

n.7 (D.C. Cir. 1988) (holding that General Counsel reports "provide the substantive

---

[4] In contrast, when the Commission acts contrary to the General Counsel's report,
the Commissioners who vote to do so must issue a statement of reasons. *See
Democratic Cong. Campaign Comm. v. FEC*, 831 F.2d 1131, 1135 (D.C. Cir. 1987);
*see also Common Cause v. FEC*, 842 F.2d 431, 451 (D.C. Cir. 1988).

basis for the Commission's actions"); *Carter/Mondale Pres. Comm., Inc. v. FEC*, 775 F.2d 1182, 1186-87 (D.C. Cir. 1985) (noting "a statement of reasons by FEC is not required . . . where reasons for that action may be gleaned from the staff's reports," particularly the "General Counsel's memoranda").

Three Commissioners independently issued a statement of reasons explaining why they voted to dismiss the Complaint. *See* Chairman Matthew S. Petersen and Comm'rs Lee E. Goodman and Caroline C. Hunter, "Statement of Reasons," MUR 6911 (Apr. 12, 2016) (hereafter, "Statement"), *at* https://www.fec.gov/files/legal/murs/6911/16044391240.pdf. The Statement adopted the General Counsel's reasoning virtually verbatim. *Id*. at 3-4. It likewise echoed the General Counsel's conclusion, "[A] committee creating and posting a Twitter profile is posting that content on a third-party's website, not creating its own website." *Id*. at 4.

Since *In re Frankel*, the FEC has declined to regulate disclaimers in association with Tweets, Twitter homepages, or Twitter timelines on the grounds the Twitter page belongs to, and is under the control of, Twitter itself, rather than individual users.[5] Recognizing the importance of, and challenges associated with, social medial, it has solicited public comment concerning potential new regulations

---

[5] The Commission has addressed other issues concerning campaign finance law's applicability to Twitter, as well. *See, e.g.*, FEC, *Great America PAC*, A.O. 2017-05 (Sept. 20, 2017) (examining use of Twitter handles to satisfy disclaimer requirements).

16

to govern political communications over the Internet, including social media channels like Twitter. *See* FEC, *Internet Communication Disclaimers; Reopening of Comment Period and Notice of Hearing*, 82 FED. REG. 46,937, 46,938 & n.9 (Oct. 10, 2017); FEC, *Internet Communication Disclaimers; Reopening of Comment Period and Notice of Hearing*, 81 FED. REG. 71,647, 71,647 (Oct. 18, 2016); *see, e.g.*, FEC, Notice of Proposed Rulemaking, *Internet Communication Disclaimers and Definition of "Public Communication*," 83 FED. REG. 12,864 (Mar. 26, 2018). The district court's decision to treat a user's Twitter page as being under a user's control, particularly if affirmed by this Court, would likely be in tension with the FEC's longstanding approach to this medium. Moreover, such a conclusion runs a substantial risk of limiting the FEC's regulatory flexibility and discretion in this area, thereby inadvertently requiring greater federal regulation of political speech over social media.

Affirming the district court's ruling also raises a substantial risk of unintended consequences under government ethics laws and rules. The district court's reasoning appears to apply with equal force to any elected official, and even any government employee. It allows an official's or employee's ostensibly personal Twitter account to be deemed an official account under governmental control simply when multiple tweets they send are deemed too closely related to their work. Sanctioning the transfiguration of private accounts into official governmental ones might mean the

17

dissemination of partisan or election-related tweets would violate the Hatch Act, 5 U.S.C. § 7323(a)(1) (prohibiting executive employees from using their "official authority or influence for the purpose of . . . affecting the result of an election").

The *Senate Ethics Manual* provides, "Senate Internet Services may only be used for official purposes. The use of the Senate Internet for personal, promotional, commercial, or partisan political purposes is prohibited." SENATE ETHICS COMM., SENATE ETHICS MANUAL, S. Pub. 108-1, at 174 (2003). The *House Ethics Manual* contains comparable prohibitions. HOUSE COMM. ON STANDARDS OF OFFICIAL CONDUCT, HOUSE ETHICS MANUAL 123 (2008) ("[O]fficial resources of the House must, as a general rule, be used for the performance of official business of the House, and hence those resources may **not** be used for campaign or political purposes.") (emphasis in original). Again, if personal or campaign Twitter accounts can be deemed official governmental accounts based on the contents of certain tweets, affirming the district court could cause Members of Congress and Senators, as well as potentially thousands of congressional staffers, to inadvertently run afoul of these provisions. Indeed, adoption of the district court's broad conception of personal Twitter accounts as government-controlled would also likely have substantial consequences under the Public Records Act for officers and employees across the government.  44 U.S.C. §§ 3301(a)(1)(A), 3303 (defining "record" and imposing preservation requirements).

18

These difficulties point to the fundamental flaw in the district court's ruling: a Twitter account that indisputably started as personal cannot become an official governmental account based on the contents of the user's biography field or tweets the user decides to send. *Cf. KFAI*, 302 F. Supp. at 567. Nationalizing the "interactive space" of a user's tweets—including those of the President—based on their content is a substantial content-based burden on that user's First Amendment rights and cannot survive strict scrutiny. *See Davis v. FEC*, 554 U.S. 724, 740 (2008) (holding a campaign finance law burdening a federal candidate's decision to engage in extensive political communications violated the First Amendment). The district court erred in forcing President Trump "to shoulder a special and potentially significant burden" for "choos[ing] to exercise [his] First Amendment right" to tweet about politics, his actions, the media, and other related topics. *Green Party of Conn. v. Garfield*, 616 F.3d 213, 244 (2d Cir. 2010) (quotation marks omitted).

Moreover, "[a]t the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern." *Hustler Mag. v. Falwell*, 485 U.S. 46, 50 (1988). The district court's ruling will impermissibly chill government officials from freely communicating with the public through their personal or campaign Twitter accounts, hampering the public's ability to receive information. Thus, this Court should reverse the district court's aggressive, overbroad ruling to avoid setting a precedent

19

concerning a relatively young technology that could have substantial unintended and unrecognized consequences for campaign finance law, government ethics law, public records law, the First Amendment and, quite likely, numerous other areas of law, as well.

## III. THE DISTRICT COURT ERRED IN CONCLUDING PRESIDENT TRUMP'S TWITTER ACCOUNT IS A DESIGNATED PUBLIC FORUM

Even assuming the "interactive space" associated with President Trump's tweets qualifies as government-controlled, the district court erred in treating it as a designated public forum. *KFAI*, 302 F. Supp. 3d at 574. Indeed, a public forum analysis is the incorrect doctrinal frame for this case. As discussed above, the Blocked Users remain free to see President Trump's tweets simply by logging out of their accounts. *KFAI*, 302 F. Supp. 3d at 554. And the Blocked Users are free to tweet any messages they wish in response to President Trump's tweets. *Id*. Any tweets the Blocked Users send will be added to the Twitter streams of each of their followers.

The only thing the Blocked Users are unable to do is reply directly to one of President Trump's tweets. Again, they are free to convey whatever message they wish by tweeting from their own accounts, and any such tweets will be transmitted to their followers (and may also be viewed by members of the public). *Id*.; *see also supra* note 2. The Blocked Users are simply deprived of the opportunity to have their

tweets also be transmitted directly to the timelines of *President Trump*'s 53.8 million followers. *See* https://twitter.com/realDonaldTrump. In other words, this isn't about the right to speak in a public forum, but rather to use the equivalent of President Trump's Christmas card list. Consequently, this Court should either view President Trump's follower list as the personal intellectual property of Mr. Donald J. Trump, to which he is entitled to limit access, or the right to take advantage of that follower list as a selective subsidy from which he may block particular people on viewpoint-based grounds.

### A. The District Court's Ruling Improperly Allows the Blocked Users to Hijack and Reap <u>the Benefits of President Trump's Follower List</u>

First, President Trump is entitled to block users from replying to his tweets because they are not entitled to take advantage of his mailing list to transmit their derogatory messages to his followers. In *San Francisco Arts & Athletics, Inc.* ("*SFAA*") *v. U.S. Olympic Comm.*, 483 U.S. 522 (1987), the Court upheld a law "prohibiting certain commercial and promotional uses of the word 'Olympic' against a First Amendment challenge.'" *Id*. at 524. The Court explained the Government has the right to prevent third parties from using a term that "acquire[d] value 'as the result of organization and the expenditure of time, labor, skill, and money' by an entity." *Id*. at 532 (quoting *Int'l News Serv. v. Assoc. Press*, 248 U.S. 215, 239 (1918)). It concluded the term "'Olympic' was the product of the USOC's [U.S.

21

Olympic Committee's] 'own talents and energy, the end result of much time, effort, and expense.'" *Id*. at 533 (quoting *Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 575 (1977)); *see also FTC v. A.P.W. Paper Co.*, 328 U.S. 193, 198 (1946) (recognizing Congress's power to prevent a person from using "words or symbols" that "creat[e] the impression that [their] products were sponsored or otherwise carried the imprimatur of the Red Cross"). Consequently, Congress could give the USOC "a limited property right in the word 'Olympic'" enabling it to prevent other people from appropriating it for their own purposes. *SFAA*, 483 U.S. at 534-35.

Critically, the Supreme Court held Congress could prevent third parties from using the term "Olympic" in connection with their own programs and events, even when they wished to "convey a political statement." *Id*. at 536. The challengers in *SFAA* wished to use the term "Olympic" to "make a political statement about the status of homosexuals in society." *Id*. at 535. The Court noted their proposed "expressive use of the word cannot be divorced from the value the USOC's efforts have given to it," *id*. at 541, and "was a clear attempt to exploit the imagery and goodwill created by the USOC," *id*. at 541 n.19. The Court concluded, "The mere fact that the [plaintiff] claims an expressive, as opposed to a purely commercial, purpose does not give it a First Amendment right to 'appropriat[e] to itself the harvest of those who have sown.'" *Id*. at 541, quoting *Int'l News Serv.*, 248 U.S. at 239-40; *see also United We Stand Am., Inc. v. United We Stand, Am. N.Y., Inc.*, 128

22

F.3d 86, 93 (2d Cir. 1997) ("Even assuming that [the defendant] might communicate its political message more effectively by appropriating [the plaintiff's] Mark, such appropriation . . . is not protected by the First Amendment.").

Here, Donald Trump amassed his list of 53.8 million followers as the result of substantial time, effort, and expense over the course of a decade. The district court's ruling allows the Blocked Users to exploit the fruits of President Trump's labor by using his follower list to disseminate their own messages to those followers—messages that in the past have been directly contrary to President Trump's. *SFAA*, 483 U.S. at 532.[6] Under *SFAA*, the First Amendment does not compel this result.

**B.    The Use of President Trump's Follower List is Effectively a Subsidy the President May Selectively Withhold from the Blocked Users on Viewpoint-based Grounds**

Rather than a designated public forum, the ability to communicate with the President's 53.8 million followers also may more accurately be viewed as a selective subsidy, facilitating certain speakers and types of speech that bolster—or at least do

---

[6] The Supreme Court went on to reject the plaintiffs' claim that the USOC discriminated against them on the grounds the USOC is not a government actor and, in any event, it "necessarily has discretion as to when and against whom it files opposition to trademark applications, and when and against whom it institutes suits." *SFAA*, 483 U.S. at 542 & n.22. Likewise, here, President Trump's decision to block certain people from his Twitter account is a private, rather than governmental, action. In any event, even if those actions were governmental, the First Amendment allows the President to stop third parties from usurping the list of followers he cultivated for their own independent purposes. *Id*.; *see also id*. at 541.

not actively interfere with, detract from, or undermine—the President's message. The Supreme Court repeatedly has held that, although the Government generally may not bar people from speaking on viewpoint-based grounds, it is not required to affirmatively facilitate or subsidize their speech and may impose viewpoint-based restrictions on such assistance. *Rust v. Sullivan*, 500 U.S. 173, 193 (1991). "When Congress established a National Endowment for Democracy to encourage other countries to adopt democratic principles, it was not constitutionally required to fund a program to encourage competing lines of political philosophy such as communism and fascism." *Id*. at 194.

To the extent President Trump's Twitter account is treated as an official government-controlled account, its purpose is to disseminate information concerning, and generate public support for, the President's legislative and political agenda. Twitter is a convenient way of allowing the President to directly communicate his message to tens of millions of people throughout the nation and even world. This Court should permit the President to take advantage of Twitter's "blocking" feature to prevent his message from being undermined and diluted through other technological aspects of the Twitter social media platform—the reply function—that are beyond his control. *Cf. Pleasant Grove City v. Summum*, 555 U.S. 460, 468 (2009) ("A government entity may exercise this same freedom to express

its views when it receives assistance from private sources for the purpose of delivering a government-controlled message.").

## IV. THE DISTRICT COURT'S ANALYSIS OF PRESIDENT TRUMP'S INTENT IS INTERNALLY CONTRADICTORY

Finally, the district court erred in concluding the purely metaphorical "interactive space" associated with President Trump's tweets constitutes a designated public forum. In determining whether a particular venue or channel of communication constitutes a public forum, the cornerstone of this Court's analysis has always been the government's intent. *See Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 802 (1985) (holding the Government creates a designated public form "only by intentionally opening a nontraditional forum for public discourse"); *Calash v. Bridgeport*, 788 F.2d 80, 83 (1986) (recognizing the "government's intent in establishing the forum as being critical to a finding that it has created a limited public forum"). To determine the Government's intent, the Court must consider the "policy and practice" relating to the venue at issue. *Cornelius*, 473 U.S. at 702; *see also Paulsen v. Cnty. of Nassau*, 925 F.2d 65, 69 (2d Cir. 1991).

Here, no written policies or rules exist protecting the right of third parties to reply to, interactive with, or follow President Trump's personal Twitter account. And the President's practice prior to the court's ruling apparently has been to block at

least some followers who submit negative or derogatory replies to his tweets. Thus, the President's conduct appears squarely contrary to an intent to open the @realDonaldTrump up as a designated public forum, including for the expression of views hostile to him or his policies. *See Lebron v AMTRAK*, 69 F.3d 650, 656 (2d Cir. 1995) ("Although Amtrak does not maintain a written policy with respect to the Spectacular, its practice is clear; it has never opened the Spectacular for anything except purely commercial advertising.").

In *Hotel Employees & Restaurant Employees Union 100 v. City of New York Dep't of Parks and Recreation*, 311 F.3d 534, 539 (2d Cir. 2002), this Court concluded the fountain plaza at the Lincoln Center performing arts complex, owned by New York City, did not constitute a designated public forum. It recognized "the Plaza is an aesthetically pleasing landmark and a community symbol of the arts, as well as a gathering place for those attending performances at Lincoln Center." *Id*. The Court nevertheless concluded, "Although the Plaza's design clearly invites passers-by to stroll through or linger, the Plaza was not created primarily to operate as a public artery, nor to provide an open forum for all forms of public expression." *Id*.

Likewise, here, although the @realDonaldTrump account provides a convenient means of disseminating information to the President's followers, there is no evidence it was created as a tool for mounting attacks on the very policies or

developments the President is attempting to announce. Thus, the district court erred by placing far too little weight on the President's intent in establishing and using the @realDonaldTrump account.

**CONCLUSION**

For these reasons, this Court should reverse the trial court's judgment as to the Individual Blocked Users and order summary judgment for the Government on their claims. It should also vacate the trial court's judgment as to the Knight First Amendment Institute and order dismissal of its claims.

Respectfully submitted,

/s/ Dan Backer_____
Dan Backer
POLITICAL.LAW PLLC
441 N. Lee Street, Suite 300
Alexandria, VA 22314
(202) 210-5431
dan@political.law
*Counsel for Amicus Coolidge-Reagan Foundation*
*Application for admission
pending

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Second Circuit Local Rules 29.1(c) and 32(a)(4)(A) because it contains 6,294 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using the latest version of Microsoft Word in Times New Roman 14-point font, a proportionally spaced typeface.

/s/ Dan Backer_____
Dan Backer
*Counsel for Amicus Coolidge-Reagan Foundation*
*Application for admission pending

**CERTIFICATE OF SERVICE**

I hereby certify that on August 23, 2018, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Second Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ Dan Backer_____
Dan Backer
*Counsel for Amicus Coolidge-Reagan Foundation*
*Application for admission pending