# 18-1691

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY, REBECCA BUCKWALTER, PHILIP COHEN, HOLLY FIGUEROA, EUGENE GU, BRANDON NEELY, JOSEPH PAPP, NICHOLAS PAPPAS,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States, DANIEL SCAVINO, in his official capacity as White House Director of Social Media and Assistant to the President,

*Defendants-Appellants,*

SARAH HUCKABEE SANDERS, in her official capacity as White House Press Secretary

*Defendant.*

*On Appeal from the United States District Court
for the Southern District of New York* – No. 1:17-cv-5205 (Buchwald, J.)

## BRIEF OF ELECTRONIC FRONTIER FOUNDATION AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS-APPELLEES

David Greene
ELECTRONIC FRONTIER FOUNDATION
*Attorney for Amicus Curiae*
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
davidg@eff.org

**DISCLOSURE OF CORPORATE AFFILIATIONS AND
OTHER ENTITIES WITH A DIRECT FINANCIAL INTEREST IN
LITIGATION**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Amicus Curiae Electronic Frontier Foundation states that it does not have a parent corporation and that no publicly held corporation owns 10% or more of its stock.

By:  /s/ David Greene
David Greene

**TABLE OF CONTENTS**

DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER ENTITIES WITH A DIRECT FINANCIAL INTEREST IN LITIGATION ...........................i

TABLE OF CONTENTS ................................................................ ii

TABLE OF AUTHORITIES ................................................................ iii

STATEMENT OF INTEREST ................................................................1

INTRODUCTION ................................................................2

ARGUMENT ................................................................4

    I.    SOCIAL MEDIA HAS BEEN WIDELY ADOPTED BY GOVERNMENTAL AGENCIES AND OFFICIALS AT ALL LEVELS TO COMMUNICATE TO AND WITH THEIR CONSTITUENTS. ........4

    II.    MEMBERS OF THE PUBLIC HAVE A FIRST AMENDMENT RIGHT OF ACCESS TO THE SOCIAL MEDIA FEEDS OF GOVERNMENTAL OFFICIALS AND AGENCIES; THIS RIGHT IS INFRINGED WHEN THEY ARE BLOCKED BECAUSE THE OFFICIAL DISLIKES THEIR VIEWPOINT ................................................................25

    III.    MEMBERS OF THE PUBLIC HAVE A FIRST AMENDMENT RIGHT TO COMMUNICATE WITH GOVERNMENTAL OFFICIALS THROUGH SOCIAL MEDIA WHEN SUCH CHANNELS ARE GENERALLY OPEN TO THE PUBLIC; THIS RIGHT IS INFRINGED WHEN THEY ARE BLOCKED BECAUSE THE OFFICIAL DISLIKES THEIR VIEWPOINT. ................................................................30

CONCLUSION................................................................46

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS PURSUANT TO FED. R. APP. P. 32(A)(7)(C)................................................................48

CERTIFICATE OF SERVICE ................................................................49

# TABLE OF AUTHORITIES

**Cases**

*American Broadcasting Companies, Inc. v. Cuomo*,
570 F.2d 1080 (2d Cir. 1977) ................................................................... 26, 27

*Anderson v. Cryovac*,
805 F.2d 1 (1st Cir. 1986) ............................................................................. 28

*Borreca v. Fasi*,
369 F. Supp. 906 (D. Hawaii 1974) ............................................................. 28

*Bradford v. Director, Employment Security Department*,
128 S.W.3d 20 (2003) ................................................................................... 24

*Burton v. Mann*,
No. 47488, 2008 WL 8779064 (Va. Cir Jan. 30 2008) ................................ 24

*City of San Jose v. Superior Court of Santa Clara*,
2 Cal 5th 608 (2017) ..................................................................................... 24

*Competitive Enterprise Institute v. Office of Science & Technology Policy*,
827 F.3d 145 (D.C. Cir. 2016) ...................................................................... 24

*Davison v. Plowman*,
2017 WL 105984 (E.D. Va., Jan. 10, 2017) ............................................ 31, 32

*Griffis v. Pinal Cty.*,
156 P.3d 418 (2007) ...................................................................................... 24

*Morgan v. Bevin*,
298 Fed. Supp. 3d 1003 (E.D. Ky. Mar. 30, 2018) ...................................... 32

*News Reporter Co., Inc. v. Columbus County*,
646 S.E.2d 390 (2007) .................................................................................. 24

*O'Neill v. Shoreline*,
240 P.3d 1149 (2010) .................................................................................... 24

*Packingham v. North Carolina*,
___ U.S. ___, 137 S. Ct. 1730 (2017) ...................................................... 31, 46

*Perry Education Ass'n v. Perry Local Educators' Ass'n*,
460 U.S. 37 (1982) ................................................................. 30, 46

*Quad–City Community News Service, Inc. v. Jebens*,
334 F. Supp. 8 (S.D. Iowa 1971) .......................................... 28

*Reno v. American Civil Liberties Union*,
521 U.S. 844 (1977) ............................................................... 46

*Richmond Newspapers, Inc. v. Virginia*,
448 U.S. 555 (1980) ............................................................... 25

*Robinson v. Hunt Co. Texas*,
2017 WL 7669237 (N.D. Tex., Dallas Dec. 14, 2017) ....... 31

*Southeastern Promotions Ltd. v. Conrad*,
420 U.S. 546 (1975) ............................................................... 29

*Southwestern Newspapers v. Curtis*,
584 S.W. 2d 362 (Tex. Civ. App. 1979) ............................... 28

*Stevens v. New York Racing Ass'n, Inc.*,
665 F. Supp. 164,(E.D.N.Y. 1987) ....................................... 27

*Telemundo of Los Angeles v. City of Los Angeles*,
283 F. Supp. 2d 1095 (C.D. Cal. 2003) ................................ 29

*Times-Picayune Pub. Corp. v. Lee*,
15 Media L. Rep. 1713, 1988 WL 36491 (E.D. La. 1988) .... 26

*Toensing v. Attorney General of Vermont*,
178 A. 3d 1000 (2017) ........................................................... 24

*United Teachers of Dade v. Stierheim*,
213 F. Supp. 2d 1368 (S.D. Fla. 2002) ............................ 27, 29

*Westinghouse Broadcasting Co. v. Dukakis*,
409 F. Supp. 895 (D. Mass. 1976) .................................... 27, 29

**Constitutional Provisions**

U.S. Const. amend. I .............................................................*passim*

**Attorney General Reports**

MD 81 Op. Att'y Gen. 140 (1996) ................................................................... 25

N.D. Op. Att'y Gen. 2008-O-15 (2008) ......................................................... 25

OK AG 12 (2009) ............................................................................................ 25

Tex. Att'y Gen. ORD-1790 (2001) ................................................................. 25

**Other Authorities**

Andrew J. Tobis, "Cleveland Mayor Frank Jackson fields questions – some of them not so tough – in his first Twitter town hall," Cleveland.com, (Aug. 30, 2017) ................................................................................................. 36

Annie Linskey, *In Annapolis, a second debate in cyberspace*, The Baltimore Sun (Mar. 17, 2012, 5:36 PM) .............................................................................. 8

Chang Sup Park, *Do Social Media Facilitate Political Learning? Social Media Use for News, Reasoning, and Political Knowledge*, Journal of Social Media and Society Vol. 6 (2017) .................................................................................. 5

Congressional Management Foundation, *#SocialCongress2015*, (2015) ................. 7

Congressional Research Service, *Social Media in Congress: The Impact of Electronic Media on Member Communications*, R44509, (May 26, 2016) .......... 6

Greg Bluestein, *Georgia lawmaker: Talk of ditching Confederate statutes could cause Democrat to 'go missing',* The Atlanta Journal Constitution, (Aug. 30, 2017) ................................................................................................. 8

Jill Lepore, "The State of the Presidential Debate," THE NEW YORKER, (Sept. 19, 2016) ................................................................................................ 3

Joanne Kenen, *The selling of Obamacare 2.0*, Politico (Nov. 13, 2014, 5:10 AM). 6

Lyrissa B. Lidsky, Government Sponsored Social Media and Public Forum Doctrine under the First Amendment: Perils and Pitfalls, 19 Pub. Law. 2 (2011) ............................................................................................................. 30

Michael Gove and Kai Diekmann, *Full transcript of interview with Donald Trump*, The Times, (Jan. 16, 2017, 9:00 AM) ............................... 22

Mickoleit, A., *Social Media Use by Governments: A Policy Primer to Discuss Trends, Identify Policy Opportunities and Guide Decision Makers*, OECD Working Papers on Public Governance, No. 26, OECD Publishing, Paris (2014) ...................................................................................................... 23

Nahal Toosi, *Nikki Haley's Twitter account raises protocol concerns*, Politico (May 20, 2018) ...................................................................................... 22

Nixle, *Public Safety Communications* ................................................................... 2

Open Government Guide, Reporters Committee for Freedom of the Press ........... 25

Ron Eland, *City adopts emergency alert system*, SEDONA RED ROCK NEWS, (Oct. 18, 2017) ..................................................................................... 2

S. Shyam Sundar, *et al.*, "Source Cues in Online News: Is Proximate Source More Powerful than Distal Sources," Journalism and Mass Communications Quarterly, vol. 88 (Dec. 1, 2011) ............................................. 23

Sarah Perez, *Facebook officially launches Town Hall for contacting government reps, adds local election reminders*, TechCrunch (2016) ................................... 34

Tamara Keith, "Commander-In-Tweet: Trump's Social Media Use and Presidential Media Avoidance," NPR, (Nov. 18, 2016, 3:46 PM) ...................... 3

Tess Eyirch, *The Future of the Town Hall is Online*, University of California, Riverside News (Oct. 1, 2018) ................................................................ 35

Tom Precious, *Cuomo and lawmakers start new year on nasty note, via Twitter and speeches*, The Buffalo News, (Jan. 4, 2017) .................................... 8

U.N. Dep't of Econ and Soc. Affairs, *United Nations E-Government Survey 2016: E-Government in Support of Sustainable Development*, U.N. Sales No. E.16.II.H.2 (2016) ................................................................................. 4

U.S. Dept. of Education, "#AskFAFSA Office Hours: Back to School," Federal Student Aid (Aug. 29, 2018) .................................................... 33

U.S. Digital Registry ........................................................................................... 5

U.S. State Department Twitter, "#SecKerry will start tweeting from @StateDept. Tweets from him will have his initials -JK" (Feb. 4, 2013) .............................. 22

## STATEMENT OF INTEREST[1]

Recognizing the Internet's power as a tool of democratization, the Electronic Frontier Foundation (EFF) has, for over 25 years, worked to protect the rights of users to transmit and receive information online. EFF is a non-profit civil liberties organization with more than 37,000 dues-paying members, bound together by mutual and strong interest in helping the courts ensure that such rights remain protected as technologies change, new digital platforms for speech emerge and reach wide adoption, and the Internet continues to re-shape governments' interactions with their citizens. EFF frequently files amicus briefs in courts across the country, including briefs that highlight the pervasive use of the Internet and social media platforms as a means of delivering governmental services and communicating, back and forth, with constituents. Among its participation in many other landmark cases, EFF submitted an amicus brief in *Packingham v. North Carolina*, 137 S. Ct. 1730, (U.S. 2017), that was cited numerous times in the Court's opinion, and addressed many of the same issues addressed in the brief submitted here.

---

[1] Pursuant to Federal Rule of Appellate Procedure Rule 29(c), EFF certifies that no person or entity, other than amicus, its members, or its counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part. This brief is filed pursuant to Federal Rule of Appellate Procedure Rule 29(a)(2) with the consent of all parties.

**INTRODUCTION**

President Trump's use of @RealDonaldTrump to announce U.S. policy and communicate directly with the American people is just one example of how Twitter and other social media are widely used by officials and agencies at all levels of government across the country. Social media has proved to be an efficient way for government to communicate vital information to the public. Indeed, as was seen with recent spate of natural disasters, social media serves critical public safety purposes. It is not surprising that some private social media platforms are specifically designed for such purposes.[2]

Given the pervasive use of social media, this Court must recognize that individuals have First Amendment rights both to receive governmental messages transmitted through social media as well as to participate in the interactive communicative forums created by them. And this Court must find that the President's viewpoint-based blocking of the plaintiffs burdens their First Amendment rights, and is thus unconstitutional.

President Trump's use of Twitter has familiar historical analogs. Past U.S. Presidents adopted new communication technologies to engage directly with the public. FDR's Fireside Chats were delivered directly into Americans' homes by

---

[2] *See, e.g.,* Nixle, *Public Safety Communications,* http://www.nixle.com/public-safety-communications/; Ron Eland, City adopts emergency alert system, Sedona Red Rock News, (Oct. 18, 2017), http://www.redrocknews.com/news/88888896-city-news/67159-city-adopts-emergency-alert-system.

radio.[3] Eisenhower broadcast Presidential announcements on public access television.[4] And starting with the 1960 election, Presidential candidate debates were televised.[5]

And what was so obvious with those historic analogs, should be as obvious now. It would have been plainly impermissible for the President to punish certain individuals by making it more difficult for them to get these broadcasted messages than every other American. A court surely would have rejected a President's attempt to get a court order barring all broadcasters from momentarily delivering their signal to certain viewers disfavored by the President.

The result should be no different merely because social media platforms make such blocking easy. What might have required a court order before is now easily accomplishable as a feature of the platforms. But the effect remains the same: disfavored citizens are denied their First Amendment rights.

---

[3] Tamara Keith, *Commander-In-Tweet: Trump's Social Media Use and Presidential Media Avoidance*, NPR, (Nov. 18, 2016, 3:46 PM), http://www.npr.org/2016/11/18/502306687/commander-in-tweet-trumps-social-media-use-and-presidential-media-avoidance.

[4] *Id*.

[5] Jill Lepore, *The State of the Presidential Debate*, The New Yorker, (Sept. 19, 2016), https://www.newyorker.com/magazine/2016/09/19/the-state-of-the-presidential-debate.

**ARGUMENT**

I.     **SOCIAL MEDIA HAS BEEN WIDELY ADOPTED BY GOVERNMENTAL AGENCIES AND OFFICIALS AT ALL LEVELS TO COMMUNICATE TO AND WITH THEIR CONSTITUENTS.**

Governments all over the country – indeed, all over the world – use various social media platforms to disseminate important information to the public, and to debate the policies of the day with each other and with their constituents, all in a rapid and freely accessible manner.

In 2016, a United Nations study on the use of social media and other web-based tools for the delivery of government services online and for the participation of the public, reported that 152 member-states out of 193 (roughly 80%) include links to social media and other networking features on their national websites. U.N. Dep't of Econ and Soc. Affairs, *United Nations E-Government Survey 2016: E-Government in Support of Sustainable Development*, at 65, U.N. Sales No. E.16.II.H.2 (2016).[6] And 20 percent of member-states reported that engagement through social media led to new policy decisions and services. *Id.* at 68. Social media was viewed as a low-cost, ready-made solution for posting basic public-sector information and for citizen collaboration, regardless of a country's economic level. *Id.* at 3.

---

[6] http://workspace.unpan.org/sites/Internet/Documents/UNPAN97453.pdf.

Social scientists who have studied the diversity and quality of information from both traditional media and online media have found that Twitter is "information-rich enough for citizens to get substantial information about political issues" and that Twitter's large audience and ability to participate anonymously allow "Twitter users to access diverse political content."[7]

In the last decade as the use of social media has grown generally, the political use of social media has increasingly factored in U.S. national and state elections, the legislative process, and how government agencies offer services to the public. Over 10,000 social media profiles for U.S. federal agencies and sub-agencies have been registered with the United States Digital Service.[8] And that impressive number is an underestimate since many agencies remain unregistered despite their active participation on social media. For example, the United States Department of Agriculture's Food and Nutrition Service actively uses Twitter (@USDANutrition) to promote healthy food options and opportunities for nutrition education but has not registered its account with the U.S.D.S.

---

[7] Chang Sup Park, *Do Social Media Facilitate Political Learning? Social Media Use for News, Reasoning, and Political Knowledge*, Journal of Social Media and Society Vol. 6, pg. 206, 213 (2017), *available at* http://thejsms.org/index.php/TSMRI/article/view/292.

[8] For a searchable database of registered federal government profiles, *see* U.S. Digital Registry, https://usdigitalregistry.digitalgov.gov/.

Federal agencies frequently used and continue to use social media to promote U.S. policy interests. The Obama Administration's Department of Health and Human Services' social media feeds advocated for passage of the Affordable Care Act. After passage, it continued to educate the public on enrollment periods and new protections for healthcare, with digital advertisements driving at least 4 million users to sign up with HealthCare.gov in the first year.[9] Similarly, the U.S. Department of State's Twitter page, @StateDept, routinely posts statements, photographs, and links regarding official visits with foreign dignitaries and the U.S. position on world events. And the Department of Homeland Security has continued to use its Twitter page, @DHSgov, in both the Obama and Trump administrations to promote October as Cyber Security Awareness Month, providing tips to the public on simple steps they can take to secure their online information.

Members of Congress are also actively engaged in social media as a method of conversing with their constituents and connecting with their communities. All 100 Senators and the overwhelming majority of Representatives use social media. Congressional Research Service, *Social Media in Congress: The Impact of Electronic Media on Member Communications*, R44509, (May 26, 2016).[10] In a

---

[9] Joanne Kenen, *The selling of Obamacare 2.0*, Politico (Nov. 13, 2014, 5:10 AM), http://www.politico.com/story/2014/11/obamacare-enrollment-2015-112846.

[10] https://fas.org/sgp/crs/misc/R44509.pdf.

survey of members of Congress and their staff, the Congressional Management Foundation found that 76% of respondents felt that social media enabled more meaningful interactions with constituents, 70% found that social media made them more accountable to their constituents, and 71% said that constituent comments directed to the representative on social media would influence an undecided lawmaker. Congressional Management Foundation, *#SocialCongress2015*, (2015).[11]

After large policy announcements from the executive branch, Members of Congress often disseminate their opinions via social media, and even ask the public to interact with their positions. When President Trump announced his intention to pull out of the Paris Climate Accord, Senator Kamala Harris tweeted out a petition urging people to sign and encourage the President to rethink his decision.



---

[11] http://www.congressfoundation.org/storage/documents/CMF_Pubs/cmf-social-congress-2015.pdf.

State legislatures also extend public debate in their chambers to social media forums so that they are more visible by the public, specifically their constituents. In New York, debates over funding and employee salaries between the legislature and the governor's office took place on Twitter.[12] In Maryland, legislators debated the benefits of state legislation versus county regulations.[13] And in Georgia, representatives engaged in heated debate over the removal of confederate monuments.[14]

The use of social media as an efficient method of communication from governmental offices to the public is perhaps best seen with state and local governments. Local police departments, councilpersons, mayors, and state legislatures use their Facebook, Twitter, and other social media feeds as real-time bulletin boards for important community information.

---

[12] Tom Precious, *Cuomo and lawmakers start new year on nasty note, via Twitter and speeches*, The Buffalo News (Jan. 4, 2017), http://buffalonews.com/2017/01/04/cuomo-lawmakers-start-new-year-nasty-note-via-twitter-speeches/.

[13] Annie Linskey, *In Annapolis, a second debate in cyberspace*, The Baltimore Sun (Mar. 17, 2012, 5:36 PM), http://www.baltimoresun.com/news/maryland/politics/bs-md-lawmaker-twitter-20120317-story.html.

[14] Greg Bluestein, *Georgia lawmaker: Talk of ditching Confederate statutes could cause Democrat to 'go missing,'* The Atlanta Journal Constitution, (Aug. 30, 2017), http://politics.blog.ajc.com/2017/08/29/georgia-republican-warns-democrat-she-could-go-missing-over-criticism-of-civil-war-monuments/.

The crucial public benefits of social media use by local governments was made starkly obvious during recent natural disasters. These uses highlight the real dangers of denying individuals access to the information disseminated by their government via social media.

Consider the multiple hurricanes that made landfall in the United States in 2017. The Mayor of San Juan Puerto Rico used her Twitter feed, @CarmenYulinCruz, to direct the city towards emergency resources in the wake of Hurricane Maria and alert residents on the status of the slow and ongoing recovery. Similarly, the Mayor of Houston, @SylvesterTurner, and the Mayor of Dallas, @Mike_Rawlings, provided their residents with the latest information on Hurricane Harvey relief through Twitter and other social media pages. And the governor of Florida, @FLGovScott, tweeted to alert citizens on evacuation from Hurricane Irma, provide safety tips for those who stayed in their homes, and alert homeowners during the recovery how they could request federal aid.



**Carmen Yulín Cruz** ✔ @CarmenYulinCruz · 5 Sep 2017
Casa Dominicana lista para recibir refugiados. Ya listo espacio para 50 refugiados. Capacidad total para 70 personas. @SJUCiudadPatria

Translated from Spanish by ■ Microsoft

Dominican house ready to receive Refugees. Space Ready for 50 refugees. Total capacity for 70 people. @SJUCiudadPatria

💬 2       ⟲ 23       ♡ 43       ✉



**Carmen Yulín Cruz** ✔ @CarmenYulinCruz · 9 Sep 2017

Vuelve la energía al Hospital Municipal de San Juan. Gracias a la @AEEONLINE y a @utieroficial y a nuestros emplead@s mun por eu trabajo.

Translated from Spanish by ▦ Microsoft

Energy is returned to the Municipal Hospital of San Juan. Thanks to the @AEEONLINE and to @utieroficial our employees mun for the US Work.

💬 14   ⟳ 23   ♡ 83   ✉


**Rick Scott** ✔
@FLGovScott

Follow

As #Irma approaches, water is receding from bays, rivers & other waterways. DO NOT GO IN. The water will surge back & could overtake you.

12:35 PM - 10 Sep 2017

**1,659** Retweets **2,041** Likes

💬 47   ⟳ 1.7K   ♡ 2.0K   ✉



State and local agencies also play a pivotal role in directing people to breaking information about disaster zones and the government's response, as well as publishing information that enables people to take care of themselves and their loved ones in the immediate aftermath of a natural disaster. The Houston Police used Twitter to encourage people to stay on the line despite the long 911 backlog; when the city realized it was under-resourced to deal with flooding throughout the area, the police department then tweeted out requests for assistance to any resident with a boat. Florida's emergency response agency encouraged people to text their loved ones in order to get through the overloaded phone network, while the National Weather Service's outpost for the Florida Keys warned the area that Hurricane Irma presented a dire emergency for the Atlantic islands. And Texas Department of Health and Human Services took to Twitter in the aftermath of Harvey to provide people with information about how to request food assistance during their storm recovery.



**Houston Police** ✔ @houstonpolice · 27 Aug 2017

Use 911 for life-threatening emergencies ONLY; don't hang up; you are in the queue and a call taker will speak with you



**Houston Police** ✔ @houstonpolice

Please use 911 for life-threatening emergencies, and 311 or the HPD non-emergency number 713-884-3131 as appropriate.

💬 2     ↻ 231     ♡ 141     ✉

**Houston Police** ✔ @houstonpolice · 27 Aug 2017

Anyone with a boat who can volunteer to help please call 713-881-3100 #HurricaneHarvey

💬 616     ↻ 42K     ♡ 35K     ✉

**cheekygirl** @cheeksdouble07 · 27 Aug 2017

We are having trouble getting thru to the number. There is a group in East Texas ready to head there in the morning with boats. Pls advise

💬 16     ↻ 63     ♡ 258     ✉

**Houston Police** ✔
@houstonpolice

( Follow )

Replying to @cheeksdouble07

# Please keep trying. That is the number for coordinating volunteers w/boats. If we get other info we will update

5:57 PM - 27 Aug 2017

**62** Retweets **214** Likes

💬 16     ↻ 62     ♡ 214     ✉



**Florida SERT** ✔ @FLSERT · 10 Sep 2017

During disasters, sending text messages is usually faster than making phone calls as phone lines are often overloaded #FLPrepares

💬 1     🔁 200     ♡ 123     ✉



**NWS Key West** ✔
@NWSKeyWest

[ Follow ]  ⌄

# ***THIS IS AS REAL AS IT GETS***

# ***NOWHERE IN THE FLORIDA KEYS WILL BE SAFE***

# ***YOU STILL HAVE TIME TO EVACUATE***

## Please RT. #Irma



2:21 PM - 8 Sep 2017

**64,290** Retweets  **42,773** Likes




**Texas HHSC**
@TexasHHSC


Follow

D-SNAP offers short-term food assistance to families impacted by a disaster. Eligibility, application info: hhs.texas.gov/d-snap #Harvey



**Disaster SNAP Food Benefits**

Disaster SNAP offers families recovering from a disaster short-term help getting food.

hhs.texas.gov/d-snap

To be eligible, you must:
- Be from a county that has been declared a federal disaster area.
- Have experienced a loss of income, destruction of your home OR a disaster-related expense such as temporary shelter or home repairs.
- Must not currently get regular SNAP food benefits.

TEXAS Health and Human Services

Dial 2-1-1 and select Option 6 to find out when D-SNAP will be available in your area.

9:30 AM - 12 Sep 2017

Crucially, these feeds are viewed as authoritative and reliable in times of public safety and civic confusion. After Hurricane Harvey, Houston Mayor Sylvester Turner published a Facebook post to dispel rumors that citizenship documentation was needed to receive disaster aid. This post, translated into six languages, was designed to ensure the people of Houston received accurate information.



**Sylvester Turner, Mayor of Houston**
August 29 · 🌐

The rumor that we are asking for immigration papers is FALSE! This rumor is NOT true! We will NOT ask for immigration status or papers from anyone at any shelter.

Spanish:
El rumor de que estamos pidiendo papeles de inmigración es FALSO. Este rumor NO es cierto. NO pediremos papeles de inmigración ni documentación de estado inmigratorio a ninguna persona en ningún refugio.

French:
La rumeur selon laquelle nous demandons des documents d'immigration est FAUSSE! Cette rumeur est INFONDÉE! Nous n'allons demander un statut d'immigrant ou des documents d'immigration à PERSONNE dans les refuges.

Vietnamese:
Tin đồn chúng tôi yêu cầu cho xem giấy tờ di trú là KHÔNG ĐÚNG! Đây là tin đồn THẤT THIỆT! Chúng tôi sẽ KHÔNG hỏi giấy tờ hay diện di trú của bất kỳ ai tại các trung tâm tránh trú bão.

Chinese :
我們要求查看移民證件的傳言是假的。這種傳言是不實的。我們不會要求詢問在任何庇護所的任何人的移民身分或證件。

See Translation

هناك إشاعة بأننا نستعلم عن مستندات الهجرة ولكنها إشاعة كاذبة! هي إذن إشاعة **غير حقيقية!** **فإن** نطلب من أي من المقيمين في أماكن الإيواء إيضاح وضع الهجرة الخاص بهم أو إبراز أي مستندات مرتبطة بذلك.

👍 Like     💬 Comment     ↪ Share

👍❤️😮 1.4K                                    Top Comments ▼

1,409 Shares

Local officials continue to use social media as a tool for updating the public on disasters and for updating the communities affected on the status of federal aid and disaster relief. Florida Governor Rick Scott has used social media to direct the millions of Puerto Ricans who were displaced by Hurricane Maria and are now living in Florida to a compilation of resources where they can apply for a disaster case manager, find housing, and even apply for benefits like the Women, Children,

and Infants (WIC) program. Houston Mayor Turner has tweeted out resources to help people rebuilding their homes avoid fraud and city-based resources for people in need who are waiting for federal programs. And these officials have even tweeted out information on how to protect households from this year's hurricane season after the destruction of last year – giving information about tax holidays for hurricane preparedness and what people should keep on hand in anticipation of the next storm.



Rick Scott ✔
@FLGovScott

Follow

Florida continues to stand with the people of Puerto Rico on the six-month anniversary of Hurricane Maria. We will continue to do everything we can to help Puerto Ricans fully recover and move forward. Find more info on resources available here: bit.ly/2GM4tl1

10:44 AM - 20 Mar 2018

39 Retweets  111 Likes

19    39    111



**Sylvester Turner** ✓
@SylvesterTurner

Follow ⌄

HURRICANE HARVEY SURVIVORS, the National Alliance against Home Repair Fraud is here to help! Go to naahrf.org and click on "Hurricane Survivors" Or call (404) 902-6100. Don't go it alone!



**Sylvester Turner** ✓
@SylvesterTurner

Follow ⌄

Houston helps itself! While waiting on slow 💰 assistance from federal government for housing /flood mitigation, we're doing what we CAN to rebuild+move forward:
-hosting #Harvey resource & recovery fairs
-organizing/connecting volunteers w/flood survivors
postharvey.org





Local police departments also update the public through social media about

ongoing investigations, and, in many cases, individual access to these feeds is

necessary for residents and other people in the area to timely assess public safety. The Boston Police Department updated the city in the aftermath of the 2013 Boston Marathon bombing, including telling residents to shelter in place and then alerting when the bombing suspect was captured.



Similarly, the Las Vegas Police Department used Twitter to give the community real-time updates after the October 2017 mass-shooting at a country music festival, including disclosing to the public that there was only one shooter.



And in a mass-shooting at a video-game tournament in August of this year, the Jacksonville Florida Sheriff's office not only used Twitter to update the public

on the status of the investigation, but also to communicate directly with victims at the tournament so that the police department could rescue them from their hiding spots.



Public officials commonly use nominally "personal" social media profiles for these official communications. For example, when John Kerry became Secretary of State in 2013, he inherited and used the handle @StateDept.[15] But soon after he began promoting U.S. diplomatic policy through the handle @JohnKerry as his official twitter feed.[16] Former Congressman Jason Chaffetz has used his @jasoninthehouse since December 2008, after his election but before his term began, and continues to use it now, even though he resigned his seat in 2017. Senator Cory Booker has used @CoryBooker since 2008 when he was Mayor of Newark, New Jersey, long before he ran for the Senate in 2013.[17]

When President-elect Trump decided, as he told British press in January 2017, that he intended to keep his named Twitter handle, @RealDonaldTrump, because it garnered more followers than the @POTUS handle at the time,[18] he was in no way outside the norm. Heads of government institutions and political leaders

---

[15] U.S. State Department Twitter, "#SecKerry will start tweeting from @StateDept. Tweets from him will have his initials -JK" (Feb. 4, 2013), https://twitter.com/statedept/status/298433014776623104.

[16] Nahal Toosi, *Nikki Haley's Twitter account raises protocol concerns*, Politico (May 20, 2018), https://www.politico.com/story/2018/05/20/nikki-haley-personal-twitter-account-597279.

[17] Recordings of Cory Booker's tweets can be found on the Internet Archive's Way Back Machine at https://web.archive.org/web/20080101000000*/https://twitter.com/CoryBooker.

[18] Michael Gove and Kai Diekmann, *Full transcript of interview with Donald Trump*, The Times, (Jan. 16, 2017, 9:00 AM) https://www.thetimes.co.uk/article/e621220e-dbc2-11e6-a7b1-3a60b507a068.

will on average have more followers on their individual accounts than on their official or institutional ones. Mickoleit, A., *Social Media Use by Governments: A Policy Primer to Discuss Trends, Identify Policy Opportunities and Guide Decision Makers*, OECD Working Papers on Public Governance, No. 26, OECD Publishing, Paris (2014).[19] Additionally, researchers studying the psychology of online news have found that social media users and news readers do not typically distinguish between institutional and personal accounts when accessing news stories; therefore, it is unlikely that the average Twitter user in the United States distinguishes between President Donald Trump's use of @RealDonaldTrump and his use of @POTUS when accessing the accounts or reading about U.S. government policy and actions. S. Shyam Sundar, *et al.*, *Source Cues in Online News: Is Proximate Source More Powerful than Distal Sources*, Journalism and Mass Communications Quarterly, vol. 88, 719-736 (Dec. 1, 2011).

In analogous contexts, courts have found officials to be conducting governmental business despite their use of personal accounts on private third-party communications services.

For example, courts interpreting public records laws have found that emails sent from and received by the private email accounts of governmental officials to

---

[19] http://www.oecd-ilibrary.org/docserver/download/5jxrcmghmk0s-en.pdf?expires=1507662581&id=id&accname=guest&checksum=3B1D0678BEF C9B33A5B24E5706530756.

be public records. In so doing, these courts have focused on the function of the email accounts as, at least in part, a platform for conducting public business rather than a private account or a privately-run service.

The D.C. Circuit recently ordered the disclosure of emails containing government business sent to and from the personal email account of John Holdren, the former head of the Office of Science and Technology Policy, finding that the use of a private domain does not subvert citizens' right to know what the department is up to. *Competitive Enterprise Institute v. Office of Science & Technology Policy*, 827 F.3d 145, 150 (D.C. Cir. 2016).

States courts interpreting state records laws are ruling similarly, with the Supreme Court of Vermont most recently determining the accessibility of public records on private email. *See Toensing v. Attorney General of Vermont*, 178 A. 3d 1000, 1004 (2017); *City of San Jose v. Superior Court of Santa Clara*, 2 Cal 5th 608, 629 (2017); *Griffis v. Pinal Cty.*, 156 P.3d 418, 421 (2007); *Bradford v. Director, Employment Security Department*, 128 S.W.3d 20 (2003); *News Reporter Co., Inc. v. Columbus County*, 646 S.E.2d 390, 393 (2007); *Burton v. Mann*, No. 47488, 2008 WL 8779064 at *3(Va. Cir Jan. 30 2008); *O'Neill v. Shoreline*, 240 P.3d 1149 (2010). State Attorneys General have agreed. MD 81 Op. Att'y Gen.

140 (1996); N.D. Op. Att'y Gen. 2008-O-15 (2008); OK AG 12 (2009); Tex. Att'y Gen. ORD-1790 (2001).[20]

**II. MEMBERS OF THE PUBLIC HAVE A FIRST AMENDMENT RIGHT OF ACCESS TO THE SOCIAL MEDIA FEEDS OF GOVERNMENTAL OFFICIALS AND AGENCIES; THIS RIGHT IS INFRINGED WHEN THEY ARE BLOCKED BECAUSE THE OFFICIAL DISLIKES THEIR VIEWPOINT.**

Given that agencies and officials use social media to convey important public safety information, denying individuals access to those feeds because of a disapproval of their viewpoints endangers lives. And denying disfavored citizens access to policy announcements and debates among legislators hinders their ability to monitor the performance of their governmental officials and otherwise participate in their own governance.

Such discriminatory denial of access also violates the First Amendment. When governmental events and communications are generally open to the public, viewpoint-based exclusion of some individuals is unconstitutional.

This requirement of equal access was the law before the advent of social media, when governmental officials and agencies communicated to the public through the press, playing its "surrogate" role. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980) (explaining surrogate role the press plays in

---

[20] The Reporters Committee for Freedom of the Press is tracking the issue as it arises in state courts throughout the country through their online comparative Open Government Guide, found at https://www.rcfp.org/open-government-guide.

channeling information from the government to the public). Discrimination against a newspaper was in effect discriminating against that newspaper's readers.

The law should be no different now that officials and agencies can communicate directly with the public rather than through news media intermediaries: "The First Amendment guarantees a limited right of access to news regarding activities and operations of government. This right includes, at a minimum, a right of access to information *made available to the public* or made available generally to the press." *Times-Picayune Pub. Corp. v. Lee*, 15 Media L. Rep. 1713, 1988 WL 36491, at \*9 (E.D. La. 1988) (emphasis added) (nullifying a sheriff's direction that his officers not process a newspaper's public records requests, nor notify it of or allow its reporters to attend press conferences, nor notify it of significant events, such as shootings and traffic fatalities).

The Second Circuit thus held that the First Amendment rights of ABC News "and its viewing public" would "be impaired by the exclusion" of ABC from election night campaign rallies that were otherwise open to the news media. *American Broadcasting Companies, Inc. v. Cuomo*, 570 F.2d 1080 (2d Cir. 1977). "[O]nce there is a public function, public comment, and participation by some of the media, the First Amendment requires equal access to all of the media or the rights of the First Amendment would no longer be tenable." *Id.* The Second Circuit specifically rejected the argument that the right of access involved was

"necessarily the outer limit of the constitutional protection of the First Amendment." *Id.*

Likewise, in *Stevens v. New York Racing Ass'n, Inc.*, 665 F. Supp. 164, 175 (E.D.N.Y. 1987), the court ruled that a photojournalist could not be barred from bringing his camera into the racetrack paddock areas that were otherwise open to all other journalists because the event sponsor disapproved of the way the photojournalist covered the event. Such content-based restrictions on access were prohibited. But because of the important First Amendment rights involved, even content-neutral access restrictions would be unconstitutional unless the plaintiff could demonstrate that "the restriction does not serve a legitimate government objective or that the benefits derived from the restriction are fewer than the harm it causes." *Id.* at 176.

This equal access rule has wide acceptance in courts around the country in a wide variety of contexts. The rule was applied to enjoin the exclusion of a teacher's union newspaper from the School Board press room in Florida, *United Teachers of Dade v. Stierheim*, 213 F. Supp. 2d 1368, 1372-73 (S.D. Fla. 2002), and the exclusion from city council meetings in Boston of TV stations being operated by management during a labor strike. *Westinghouse Broadcasting Co. v. Dukakis*, 409 F. Supp. 895 (D. Mass. 1976). It was applied to ensure that an underground newspaper in Iowa had access to police records, *Quad–City*

27

*Community News Service, Inc. v. Jebens,* 334 F. Supp. 8, 13 (S.D. Iowa 1971) (explaining that the information "has already been made available to the public insofar as other media's reporters are the public's representatives"), and to guarantee that all media outlets had access to discovery materials the judge had shared with one media outlet. *Anderson v. Cryovac*, 805 F.2d 1, 10 (1st Cir. 1986). And it was applied against the Mayor of Honolulu who had excluded a reporter, whom the mayor found was "irresponsible, inaccurate, biased, and malicious" in his reporting, from an otherwise open press conference. *Borreca v. Fasi*, 369 F. Supp. 906, 910 (D. Hawaii 1974).

The exclusion of individuals because of government disapproval of their viewpoints raises special concerns that officials could manipulate the public's perception of them by disseminating their messages only through favorable filters. "Hand-picking those in attendance," the *Borreca* court observed, "intensifies the manipulation." *Id.*

That the public, in these cases through the press, could ultimately get the information from other, less direct channels does not cure the constitutional defect. In *Southwestern Newspapers v. Curtis,* 584 S.W. 2d 362, 363, 369 (Tex. Civ. App. 1979), the court enjoined a district attorney from requiring that reporters from a certain newspaper make appointments to gain access to official news sources, while he made them available without appointments to all other media. As the

28

court in *Westinghouse*, 409 F. Supp. at 896, found, access must be provided with "equal convenience." *See also Stierheim*, 213 F. Supp. 2d at 1374 (finding First Amendment violation where reporters were "nevertheless deprived of the newsgathering environment and opportunities" afforded to the other news media).

Nor does it matter that the government shares the access decisions with a private actor. In *Telemundo of Los Angeles v. City of Los Angeles*, 283 F. Supp. 2d 1095, 1103 (C.D. Cal. 2003), the Court found that a TV station had a First Amendment right to cover the city's official El Grito ceremony because the city and its nongovernmental co-presenters permitted another broadcaster to do so. That the city shared, and in some situations yielded, decision-making authority with a private civic organization and another broadcaster, did not diminish the city's obligation to provide equal access. *See also Southeastern Promotions Ltd. v. Conrad*, 420 U.S. 546 (1975) (applying public forum doctrine to privately owned theater leased to the city).

The First Amendment thus protects access to governmental communications, ensuring that individuals are not denied speech alerting them in times of crisis, distributing necessary information about government services, and providing transparency about elected and appointed officials' actions and statements.

**III. MEMBERS OF THE PUBLIC HAVE A FIRST AMENDMENT RIGHT TO COMMUNICATE WITH GOVERNMENTAL OFFICIALS THROUGH SOCIAL MEDIA WHEN SUCH CHANNELS ARE GENERALLY OPEN TO THE PUBLIC; THIS RIGHT IS INFRINGED WHEN THEY ARE BLOCKED BECAUSE THE OFFICIAL DISLIKES THEIR VIEWPOINT.**

Certain social media platforms in widespread use by governmental agencies and officials allow them not only to communicate to the public, but can be configured to allow the public to communicate back to the agency and with each other, thus creating governmentally controlled forums for private speech. In so doing, the government endows the public with some degree of First Amendment rights to speak in these forums. Just what kind of forum is created will depend on how the official specifically operates it.[21] But viewpoint discrimination resulting in the targeted expulsion of individual citizens and residents from these forums is barred regardless of whether the official maintains a public, limited or designated, or non-public forum. *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1982) (holding that even in a non-public forum, a speaker may not be excluded as "an effort to suppress expression merely because public officials oppose the speaker's views").

The social media platforms federal, state, and local governments commonly use – such as Twitter, Facebook, and Instagram – can be configured and used in a

---

[21] Lyrissa B. Lidsky, *Government Sponsored Social Media and Public Forum Doctrine under the First Amendment: Perils and Pitfalls*, 19 Pub. Law. 2 (2011), available at http://scholarship.law.ufl.edu/facultypub/626.

manner that creates such forums. And government officials and agencies commonly use them for these democratizing purposes. As the Supreme Court recently recognized, "[O]n Twitter, users can petition their elected representatives and otherwise engage with them in a direct manner. Indeed, Governors in all 50 states and almost every Member of Congress have set up accounts for this purpose." *Packingham v. North Carolina*, ___ U.S. ___, 137 S. Ct. 1730, 1735, (2017). Thus, in *Davison v. Plowman*, 2017 WL 105984, *2-*4 (E.D. Va., Jan. 10, 2017), the court found that the comment section to the Commonwealth Attorney's Facebook page to be a limited public forum since the County "'encourage[s]' commenters 'to engage [their] local government through social media by submitting . . . comments and questions regarding posted topics.'"

These forums are by their nature, and often by default, open to large segments of the population – potentially every person with access to the Internet around the world – and unlike physical spaces, are not constrained by size, capacity, or even time.

Whether a specific use of a social media account creates a public forum or nonpublic forum will depend on the nature of that specific use. Various courts looking at various specific uses have found some to be public forums and some not to be. *See Robinson v. Hunt Co. Texas*, 2017 WL 7669237, at *4 (N.D. Tex., Dallas Dec. 14, 2017) (finding Sheriff's Facebook page to be a nonpublic forum);

*Morgan v. Bevin*, 298 Fed. Supp. 3d 1003, 1010-1011 (E.D. Ky. Mar. 30, 2018) (denying a preliminary injunction on the finding that the governor operated his account solely as his private speech and not as a forum at all); *Davison*, 2017 WL 105984, *2-*4 (finding officials' Facebook page comments sections to be limited public forums).

Thus, a ruling upholding the district court and finding that President Trumps' specific use of @RealDonaldTrump and the interactive spaces associated with it to conduct the business of the presidency, would not automatically transform the Twitter or Facebook account of every governmental worker into a public forum. Governmental officials remain free to use their private accounts for purely private matters, and to control the interactive components of their pages and feeds in a way that excludes public participation. But any social media feed used to conduct governmental business should be treated as a governmental process, just as platforms for the conduct of governmental business were in the analog age.

The U.S. federal government has operated numerous social media profiles as forums for interactive communication for some time. The U.S. Department of Education, for example, routinely holds monthly "office hours" where parents and students can ask about the federal student loan process on Twitter using the tag

#AskFAFSA.[22] The Department of Education uses the Twitter handle @FAFSA to reply directly to individuals' questions and then compiles monthly questions and responses on a separate site for increased visibility.



Similarly, the Transportation and Security Administration maintains a Twitter feed where individuals, regardless of their nationality, can submit questions about safety regulations for flying to, from, and within the United States by tweeting to the handle @AskTSA.

---

[22] U.S. Dept. of Education, "#AskFAFSA Office Hours: Back to School," Federal Student Aid (Aug. 29, 2018), https://studentaid.ed.gov/sa/events/office-hours-2018-08.



At the local level, representatives and councilmembers open their social media profiles to their constituents by holding online versions of town halls, even promoting hashtags (searchable links) where constituents can submit their opinions and advocate for changes to improve their communities. Recognizing how common and productive the practice is, Facebook added a "Town Hall" feature, which users and elected officials can sign up for, that lets people find and call or email their representatives through the platform.[23] Social scientists who have been studying constituent engagement over the last decade have found that online

---

[23] Sarah Perez, *Facebook officially launches Town Hall for contacting government reps, adds local election reminders*, TechCrunch (2016), https://techcrunch.com/2017/03/27/facebook-officially-launches-town-hall-for-contacting-government-reps-adds-local-election-reminders/.

versions of town halls are more representative of the voting populace than their physical peers.[24]

Examples of such "virtual town halls" abound:

In 2015, the mayor of Boston, @Marty_Walsh, announced a call for collaboration on both social media and in the press to revamp Boston's City Hall and the surrounding plaza. Residents took to Twitter using the tag #CityHallPlaza to submit recommendations for the space, upload pictures as a part of the campaign, and even submit their detailed proposals for the space so that other engaged citizens could learn more.



---

[24] Tess Eyirch, *The Future of the Town Hall is Online*, University of California, Riverside News (Oct. 1, 2018), https://news.ucr.edu/articles/2018/10/01/future-town-hall-online.



In Cleveland, Mayor Frank Jackson, holds "Twitter town halls" where residents can tweet questions to him and he responds via live video.[25]

The benefits of a direct engagement forum to both government and the public are readily apparent in the emergency services context. During Hurricane Harvey, Houston Mayor Turner conversed interactively with his constituents on Facebook to deliver important information and receive information from them, respond to and dispel rumors in order to limit confusion during the crisis, and in one case ensure that emergency medical services could attend to a baby whose breathing machine would soon lose power.

---

[25] Andrew J. Tobis, *Cleveland Mayor Frank Jackson fields questions – some of them not so tough – in his first Twitter town hall*, Clevland.com, (Aug. 30, 2017), http://www.cleveland.com/cityhall/index.ssf/2017/08/cleveland_mayor_frank_jackson_60.html.



This single interaction demonstrates that even though government social media serves a widespread audience, the capabilities for tailored and direct response are remarkable. On a single tweet from President Trump, citizens can respond directly to the President and comment on his policy announcements, other lawmakers can respond to the President and comment on the policy, and citizens can then respond to those lawmakers' responses.

For example, President Trump's suggestion that New York Senator Chuck Schumer bore some policy responsibility for the October 31, 2017 terrorist attack in New York City started a multi-level debate on immigration policy that included other U.S. senators and citizens from different sides of the political spectrum.





After Representative Ted Lieu, @tedlieu, tweeted his letter calling for a congressional hearing on U.S. military deployment in Niger, individuals both supporting and opposing his position, responded with comments offering suggestions on the direction and focus of such a hearing.





When President Trump voiced his views on the Second Amendment and his support for arming teachers in opposition to gun control reform, the survivors of the recent school shooting at Marjory Stoneman Douglas High School responded directly to the President's tweets, getting thousands of "likes" from other Twitter users for the messages that they have posted in the interactive space.





Young gun-control activists continue to respond directly to elected officials as gun control has become an election issue for many of the races in the 2018 midterms.



And a statement made by Congressman and Senatorial candidate Beto O'Rouke about limiting the sale of assault rifles has caused a Twitter debate with multiple representatives of Texas politics all using the platform to assert their positions in an election year. Texas Senator John Cornyn tweeted a criticism of Representative O'Rouke's statements, which was then responded to and fact-checked by Houston Police Chief Art Acevedo.



The interactive spaces on Twitter and other social media also create a space where people can engage in extended debates about government policy and elected official's positions. President Trump's policy requiring the separation of families seeking resulted in debates on the issue in the interactive spaces of Senator Harris' tweets calling for an end to the policy. These public comments touched on the history of the program under the Obama and Bush Administrations, what will happen to the separated children, and what the court should do when the federal government has failed to meet deadlines for reunification of families.

 **Kamala Harris** ✔
@KamalaHarris

 Following ∨

A mother from Honduras who was separated from her son was told that if she signed a form, she would be reunited with her child.

"Only later did she learn that she had signed away her right to be reunified with her child."



**Separated Parents Were "Totally Unaware" They Had Waived Their Right To B...**
In affidavits filed in federal court, attorneys say parents separated from their kids at the border are telling stories of being misinformed, coerced, or tricked by immigra...
buzzfeednews.com

9:15 PM - 26 Jul 2018

16,440 Retweets   18,447 Likes

---

**Regina erion** @ReginaErion · Jul 26                              ∨
Replying to @KamalaHarris @Melissa_Spivey

All these people, deported or not, need to be reunited with their kids. These seperations were human rights violations.  And who in the hell are we in this country, to say some of these parents are not eligible to be reunited.  WTF is wrong with these people?

  ♡ 6        ⟲ 46        ♡ 286        ✉

**L.marcon** @Lmarcon3 · Jul 27                                    ∨
Where were you when obama was doing this? And Bush, and Clinton?

  ♡ 37       ⟲ 2         ♡ 24         ✉

**Silver Queen** @SilverQueen7 · Jul 27                            ∨
These inhumane acts are totally the horrific policies of the @GOP.

  ♡ 3        ⟲ 5         ♡ 86         ✉

**L.marcon** @Lmarcon3 · Jul 27                                    ∨
What hard evidence do you have? Past administrations have done the same.

  ♡ 12       ⟲          ♡ 9          ✉

**Silver Queen** @SilverQueen7 · Jul 27                            ∨
You can research it yourself. I did.

  ♡ 4        ⟲ 1         ♡ 71         ✉





It is clear then that in practice, social media platforms like Twitter that allow

for the general public to comment upon governmental posts, or communicate

directly with officials, agencies, or to otherwise participate in a publicly viewable

debate, function like the paradigmatic speakers' corner in a public park. *See Perry*, 460 U.S. at 45 (identifying streets and parks as "quintessential public forums" for "assembly, communicating thoughts between citizens, and discussing public questions"). Indeed, the interactive components of governmental social media accounts probably host these functions more than parks and streets currently do. As the Supreme Court recognized just last year, "While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the 'vast democratic forums of the Internet' in general, *Reno v. American Civil Liberties Union*, 521 U.S. 844, 868 (1977), and social media in particular." *Packingham*, 137 S. Ct. at 1735 (explaining that a denial of access to social media was a significant abridgement of First Amendment rights given modern civic and social communication).

Viewpoint discrimination in such forums plainly violates the First Amendment.

## CONCLUSION

The President's blocking of private Twitter users based on their disfavorable view of him is unconstitutional.

Social media use by governments around the world, on every level, is the rule now, not the exception. And while social media currently supplements other

methods of communication to and with the public, one could credibly predict that it will shortly become the predominant form of communication. As a result, members of the public must have a cognizable First Amendment right to receive such otherwise public communications from the government, and to participate in the forums that are created.

The First Amendment prohibits viewpoint discrimination in all analogous, pre-digital situations. It must do so here as well.

Dated: October 19, 2018

By: /s/ David Greene
David Greene
ELECTRONIC FRONTIER
FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone: (415) 436-9333
davidg@eff.org

*Counsel for Electronic Frontier Foundation*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS PURSUANT TO FED. R. APP. P. 32(A)(7)(C)**

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify as follows:

1.     This Brief of Amicus Curiae Electronic Frontier Foundation In Support of Plaintiffs-Appellees complies with the type-volume limitation, because this brief contains 5,860 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2011, the word processing system used to prepare the brief, in 14 point font in Times New Roman font.

Dated: October 19, 2018               By:  /s/ David Greene
                                            David Greene

                                      *Counsel for Amicus Curiae*
                                      *Electronic Frontier Foundation*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Brief of Amicus Curiae Electronic Frontier Foundation with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system on October 19, 2018.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: October 19, 2018          By: /s/ David Greene
                                     David Greene

*Counsel for Amicus Curiae*
*Electronic Frontier Foundation*