# No. 18-1691

————————————————————

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

————————————————————

Knight First Amendment Institute at Columbia University, Rebecca Buckwalter, Phillip Cohen, Holly Figueroa, Eugene Gu, Brandon Neely, Joseph Papp, and Nicholas Pappas,

*Plaintiffs-Appellees,*

v.

Donald J. Trump, President of the United States, and Daniel Scavino, White House Director of Social Media and Assistant to the President,

*Defendants-Appellants,*

Sarah Huckabee Sanders, White House Press Secretary,

*Defendant.*

————————————————————

On Appeal from the United States District Court
for the Southern District of New York

————————————————————

**BRIEF OF AMICI CURIAE ASHUTOSH BHAGWAT,
ERWIN CHEMERINSKY, GENEVIEVE LAKIER, LYRISSA LIDSKY,
HELEN NORTON, AMANDA SHANOR, GEOFFREY R. STONE,
LAURENCE H. TRIBE, AND REBECCA TUSHNET
IN SUPPORT OF PLAINTIFFS-APPELLEES**

————————————————————

Amy L. Marshak
Joshua A. Geltzer
Mary B. McCord
INSTITUTE FOR CONSTITUTIONAL
  ADVOCACY AND PROTECTION
GEORGETOWN UNIV. LAW CENTER
600 New Jersey Ave. N.W.
Washington, DC 20001
(202) 662-9042

*Counsel for Amici Curiae*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to 2d Cir. R. 26.1, amici curiae are natural persons and are therefore not subject to corporate disclosure statement requirements.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT..................................................................i

TABLE OF AUTHORITIES ...........................................................................................iii

INTERESTS OF AMICI CURIAE ................................................................................ 1

INTRODUCTION............................................................................................................ 1

ARGUMENT ................................................................................................................... 3

I.      By Intentionally Utilizing Twitter's Interactive Features, Defendants Created a Public Forum for Purposes of the First Amendment........................................... 3

      A.     Government-Controlled Channels of Communication Designed for Expressive Use and Generally Open to the Public Are Public Fora ........ 3

      B.     Social Media Platforms Like Twitter Empower Officials to Engage Directly With Their Constituents in Unprecedented Ways ....................... 6

      C.     Defendants' Use of Twitter Establishes That They Created a Public Forum Along With a Channel for Government Speech ........................... 9

II.     President Trump Engaged in Unconstitutional Viewpoint Discrimination When He Blocked the Individual Plaintiffs Because of Their Criticisms of Him and His Policies ....................................................................................................... 16

      A.     The First Amendment Prohibits Public Officials from Censoring Speech Because of Its Political Viewpoint............................................................. 16

      B.     Permitting the President to Selectively Block Speakers from His Twitter Account Can Mislead the Public and Distort Public Dialogue ............... 21

CONCLUSION ............................................................................................................. 26

APPENDIX, LIST OF AMICI CURIAE .................................................................... 27

CERTIFICATE OF COMPLIANCE ........................................................................... 28

CERTIFICATE OF SERVICE ..................................................................................... 29

# TABLE OF AUTHORITIES

## Cases

*Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998)..............................................................5, 11, 14

*Associated Press v. United States*,
326 U.S. 1 (1945) .......................................................................... 22

*Byrne v. Rutledge*,
623 F.3d 46 (2d Cir. 2010) ............................................................. 4

*Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*,
561 U.S. 661 (2010)....................................................................4, 18

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
473 U.S. 788, (1985)..............................................................passim

*Davison v. Loudoun County Bd. of Supervisors*,
267 F. Supp. 3d 702 (E.D. Va. 2017) ...............................11, 17, 24

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
472 U.S. 749 (1985) ...................................................................... 17

*Garrison v. Louisiana*,
379 U.S. 64 (1964) ........................................................................ 17

*Hague v. Comm. for Indus. Org.*,
307 U.S. 496 (1939)........................................................................ 3

*Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*,
505 U.S. 672 (1992)....................................................................5, 11

*Leuthy v. LePage*, No. 1:17-cv-00296-JAW, 2018 WL 4134628
(D. Me. Aug. 29, 2018) ............................................................14, 24

*Madison Joint Sch. Dist. No. 8 v. Wis. Emp't Relations Comm'n*,
429 U.S. 167 (1976)....................................................................... 23

*Matal v. Tam*,
137 S. Ct. 1744 (2017) .............................................................13, 25

*Morgan v. Bevin*,
298 F. Supp. 3d 1003 (E.D. Ky. 2018) ......................................14, 24

*Packingham v. North Carolina*,
137 S. Ct. 1730 (2017) .............................................................passim

*Page v. Lexington County Sch. Dist. One*,
531 F.3d 275 (4th Cir. 2008)........................................................ 12

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
460 U.S. 37 (1983)................................................................................4, 11, 16

*Pleasant Grove City v. Summum*,
555 U.S. 460 (2009)................................................................................6, 14, 15

*Police Dep't of Chi. v. Mosley*,
408 U.S. 92 (1972) ..................................................................................... 16

*Reno v. ACLU*,
521 U.S. 844 (1997)................................................................................7, 18

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995).................................................................................. 5

*Se. Promotions, Ltd. v. Conrad*,
420 U.S. 54 (1975) ..................................................................................5, 12

*Sutliffe v. Epping Sch. Dist.*,
584 F.3d 314 (1st Cir. 2009) ...................................................................... 18

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
135 S. Ct. 2239 (2015) ...................................................................... 6, 13, 14, 23

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989)................................................................................ 20

## Other Authorities

*About*, Twitter, https://about.twitter.com/ ................................................... 8

*Elections Integrity*, Twitter, https://about.twitter.com/en_us/values/elections-integrity.html................................................................................ 8

Erik Ortiz, *Maryland Governor Settles Lawsuit with ACLU over Facebook Censorship*, NBC News, Apr. 3, 2018, https://www.nbcnews.com/politics/politics-news/maryland-governor-settles-lawsuit-aclu-over-facebook-censorship-n862461 ........................... 24

Helen Norton, *Government Speech and the War on Terror*,
86 Fordham L. Rev. 543 (2017) ................................................................. 23

*Inclusion and Diversity*, Twitter, https://careers.twitter.com/en/diversity.html .............. 8

Letter from Counsel for Appellees to Counsel for Appellants (Sept. 12, 2018), *available at* https://knightcolumbia.org/sites/default/files/content/Additional_Blocked_Users_Letter_9_12_18.pdf ................................................................. 15

Lyrissa Lidsky, *Public Forum 2.0*, 91 B.U. L. Rev. 1975 (2011) ...................................... 21

Maeve Duggan & Aaron Smith, Pew Research Ctr., *The Political Environment on Social Media* (Oct. 25, 2016) http://assets.pewresearch.org/wp-content/uploads/sites/14/2016/10/24160747/PI_2016.10.25_Politics-and-Social-Media_FINAL.pdf .... 22

*Muting Accounts on Twitter*, Twitter, https://support.twitter.com/articles/20171399... 19

Nolan D. McCaskill, *Trump Credits Social Media for His Election*, Politico, Oct. 20, 2017, https://www.politico.com/story/2017/10/20/trump-social-media-election-244009........................................................................................ 8

*Our Values*, Twitter, https://about.twitter.com/en_us/ values.html ............................. 8

Seva Gunitsky, *Corrupting the Cyber-Commons: Social Media as a Tool of Autocratic Stability*, Perspectives on Politics, Mar. 2015, at 42..................................................................... 24

Tim Wu, *Is the First Amendment Obsolete?*, Knight First Amendment Institute Emerging Threats Series (Sept. 2017), https://knightcolumbia.org/content/tim-wu-first-amendment-obsolete ................................................................................................. 25

<h1 style="text-align:center">INTERESTS OF AMICI CURIAE<sup>*</sup></h1>

Amici legal scholars are experts on the First Amendment who have taught courses in constitutional law or the First Amendment, published articles and books on these topics, and dedicated significant attention to the study of First Amendment protections. Based on their experience, amici seek to draw attention to the critical First Amendment values at stake when public officials block individuals from participating in public fora on social media. Amici are listed in the Appendix.

<h1 style="text-align:center">INTRODUCTION</h1>

The First Amendment principles that govern this case are well established. In its own communications, the government may express its views, just as any individual may do. But when a government official opens a space to the public and invites citizens to share their thoughts with the official and other interested citizens, he creates a public forum for speech. The official may not then selectively restrict access to that forum by barring viewpoints he does not like because, for example, a speaker makes comments critical of the official or his policies.

Increasingly, elected officials and their constituents have turned to Twitter, Facebook, and other social media platforms to engage in dialogue about important matters of public policy and public governance. When officials selectively block those

---

* The parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no person or entity, other than amici and their counsel, made a monetary contribution intended to fund the preparation or submission of this brief.

who criticize them from participating in the debate occurring on those officials' social media accounts, the role of social media as "the modern public square," *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017), is threatened in critical ways. The blocked users are denied the opportunity to participate fully in the rapid, ongoing conversations occurring on Twitter and other social media. And even more fundamentally, blocking users based on their opinions poses the very dangers that the First Amendment's ban on viewpoint discrimination has long sought to prevent: allowing the government to silence its critics, foster warped perceptions of officials' popularity, and chill dissenting voices who may avoid speaking out for fear of reprisal.

That this case involves communications on social media rather than at an in-person town hall meeting provides no valid reason to forsake settled First Amendment principles. Defendants President Donald J. Trump and Daniel Scavino, the White House Director of Social Media, hold out the @realDonaldTrump account as an official presidential account where the American people may read and engage with the President's commentary; "anyone with a Twitter account who has not been blocked may participate in the interactive space" created by each tweet sent by the account; and "the interactive space of the President's tweets accommodates a substantial body of expressive activity." SPA 61–62. Therefore, as the district court correctly held, "the interactive space for replies and retweets created by each tweet sent by the @realDonaldTrump account" qualifies as a public forum. SPA 55, 61–62. And as the district court further concluded, President Trump engaged in

2

impermissible viewpoint discrimination when he blocked plaintiffs from participating in that forum because they criticized him and his policies.  SPA 63.

Affirming the district court's conclusions on these issues will in no way undermine President Trump's ability as a public official to engage in his own speech through social media and to select those voices he listens to and amplifies.  Rather, affirming the district court's decision will uphold democratic dialogue against efforts by officials at all levels of government to silence dissent.  Amici therefore urge this Court to affirm the district court's conclusions as to these core First Amendment issues.

## ARGUMENT

I. **By Intentionally Utilizing Twitter's Interactive Features, Defendants Created a Public Forum for Purposes of the First Amendment.**

A. **Government-Controlled Channels of Communication Designed for Expressive Use and Generally Open to the Public Are Public Fora.**

The Supreme Court has long recognized limitations on the government's ability to restrict speech in certain spaces, or fora.  *See Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939).  The Court has referred generally to three such types of fora: "the traditional public forum, the public forum created by government designation, and the nonpublic forum."  *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985).

"Traditional public fora are those places," like public streets and parks, "which 'by long tradition . . . have been devoted to assembly and debate.'"  *Id.* (quoting *Perry*

*Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)). "In addition to traditional public fora, a public forum may be created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Id.*[1] In a nonpublic forum, "the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry*, 460 U.S. at 46.

Although the government is neither "required to create" a designated public forum in the first place nor "required to indefinitely retain [its] open character . . . , as long as it does so it is bound by the same standards as apply in a traditional public forum." *Id.* at 45–46. For both traditional and designated public fora, "[r]easonable time, place, and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest." *Id.* at 46. But the

---

[1] The Supreme Court more recently has described as a separate category the "limited public forum," in which the relevant property may be "limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 561 U.S. 661, 679 n.11 (2010) (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009)). Because any restrictions on speech in a designated or limited public forum must be "reasonable and viewpoint-neutral," *id.* (quoting *Summum*, 555 U.S. at 470), and President Trump engaged in viewpoint discrimination by barring plaintiffs because they criticized him and his policies, this Court need not decide whether the forum at issue is a designated or limited public forum. *Cf. Byrne v. Rutledge*, 623 F.3d 46, 54 n.8 (2d Cir. 2010) (applying a similar approach).

government is forbidden "to exercise viewpoint discrimination, even when the . . . forum is one of its own creation." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Indeed, even in a nonpublic forum, the First Amendment prohibits discrimination on the basis of a speaker's viewpoint. *Cornelius*, 473 U.S. at 806.[2]

The government creates a designated public forum "by intentionally opening a nontraditional forum for public discourse." *Cornelius*, 473 U.S. at 802. The government's intent is established by its "policy and practice" with respect to its use of the property, "the nature of the property," and the property's "compatibility with expressive activity." *Id.* A public space that is "designed for and dedicated to expressive activities," *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555 (1975), or that "has as 'a principal purpose . . . the free exchange of ideas,'" *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679 (1992) (*ISKCON*) (quoting *Cornelius*, 473 U.S. at 800), presumptively qualifies as a public forum. Spaces fulfilling multiple functions may serve as a public forum so long as "the open access and viewpoint neutrality commanded by the [forum] doctrine is 'compatible with the intended purpose of the property.'" *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 673 (1998) (quoting *Perry*, 460 U.S. at 49).

---

[2] Defendants do not argue that the @realDonaldTrump Twitter account is a nonpublic forum. Nor would it aid them to do so because President Trump clearly engaged in forbidden viewpoint discrimination in blocking the individual plaintiffs. *See infra* Part II.A.

5

By contrast, when the government itself speaks, "the Free Speech Clause has no application," and the government may adopt a particular viewpoint and reject others. *Pleasant Grove City v. Summum*, 555 U.S. 460, 467–68 (2009). In determining whether the government, rather than a private party, is engaged in speech, the Supreme Court looks to multiple factors, including whether the communication historically has conveyed a message from the government, whether the speech is "closely identified in the public mind" with the government, and whether the government maintains "control over the messages conveyed." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2248–49 (2015).

### B. Social Media Platforms Like Twitter Empower Officials to Engage Directly With Their Constituents in Unprecedented Ways.

As the Supreme Court has recognized, the Internet has wrought a transformative shift in American public life. Exchanges that once occurred in public parks and on street corners are now channeled into social media and other virtual spaces. Public officials at all levels of government now use Twitter, Facebook, and other social media to engage directly with their constituents. *See Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017) (noting that almost all members of Congress and all governors have social media accounts). Having dramatically lowered the barriers to public participation, the Internet has amplified citizens' voices and has made it possible for constituents to hear from, speak to, and talk about their elected officials in real time.

Since their earliest encounters with the medium, courts have appreciated the democratizing potential of the Internet as "a vast platform from which to address and hear from a worldwide audience." *Reno v. ACLU*, 521 U.S. 844, 853 (1997). In providing "relatively unlimited, low-cost capacity for communication," the Internet enables virtually anyone to "become a town crier with a voice that resonates farther than it could from any soapbox." *Id.* at 870. The Supreme Court has identified "social media in particular" as "the most important place[] . . . for the exchange of views" in contemporary life, and has compared it to "the modern public square" where a "private citizen [may] make his or her voice heard." *Packingham*, 137 S. Ct. at 1735, 1737.

On Twitter, the medium at issue in this case, users converse publicly with one another on urgent social and political issues, inviting real-time responses from interested contributors. Twitter users post short messages ("tweets"), which other users may "like," reply to, or repost ("retweet"). Users may then respond to those replies and retweets in an ensuing conversation. A user's tweets are displayed in reverse chronological order in that user's timeline, with the "comment thread" (composed of nested likes, replies, and replies-to-replies) displayed below the tweet. Twitter users may follow other users, allowing them to receive real-time notifications when the followed user tweets, and users generally may view any other Twitter user's tweets, unless a user restricts access to her account by, for example, blocking another user or "protecting" her account, which allows only those who follow the user to view

7

the tweets.  Even without a Twitter account, people generally may view the conversations occurring on Twitter users' accounts, although only Twitter users may tweet, reply, retweet, or like a post in response.  By building a platform for robust, multi-faceted conversations, Twitter enables constituents to "petition their elected representatives and otherwise engage with them in a direct manner."  *Packingham*, 137 S. Ct. at 1735.  President Trump has even claimed, "without social media, I'm not sure that I'd be here today."  Nolan D. McCaskill, *Trump Credits Social Media for His Election*, Politico, Oct. 20, 2017, https://www.politico.com/story/2017/10/20/trump-social-media-election-244009.

Twitter's vast capacity to stimulate civic discourse is by design.  Twitter's corporate ethos emphasizes "free expression" and the power of "every voice . . . to impact the world."  *Our Values*, Twitter, https://about.twitter.com/en_us/values.html.  Twitter prides itself on giving "everyone the power to create and share ideas and information instantly, without barriers."  *Elections Integrity*, Twitter, https://about.twitter.com/en_us/values/elections-integrity.html.  And, as Twitter promotes on its website, "[p]eople come to Twitter to freely express themselves," to "[s]park a global conversation," and to "[s]ee every side of the story."  *Inclusion and Diversity*, Twitter, https://careers.twitter.com/en/diversity.html; *About*, Twitter, https://about.twitter.com/.

### C. Defendants' Use of Twitter Establishes That They Created a Public Forum Along With a Channel for Government Speech.

By taking advantage of Twitter's unprecedented capacity for dynamic engagement, defendants designated the interactive spaces of the @realDonaldTrump Twitter account as a public forum.[3]

As the district court recognized, "[t]he interactivity of Twitter is one of its defining characteristics," for "Twitter as a platform is designed to allow users to interact with other Twitter users in relation to their tweets." SPA 62 (brackets and internal quotation marks omitted). President Trump's @realDonaldTrump Twitter account is a prime example of this phenomenon. The account is "generally accessible to the public at large"—including both the President's now over 55 million Twitter followers and non–Twitter users alike—"without regard to political affiliation or any other limiting criteria." A55 (Stip. ¶ 36). The President has not opted to "protect" his tweets—*i.e.*, make them accessible only to his followers—or to limit generally which users can follow @realDonaldTrump or comment on his tweets, except where he has blocked a user. *Id.* And "President Trump has not issued any rule or statement

---

[3] Plaintiffs-appellees contend that the public forum at issue is best understood to encompass the comment thread attached to each @realDonaldTrump tweet. *See* Appellees' Br. 10 n.5. The district court held that "the interactive space for replies and retweets created by each tweet sent by the @realDonaldTrump account" qualifies as a public forum, SPA 55, 61–62, but not the remainder of the comment thread, SPA 50. Because the individual plaintiffs were excluded from a public forum in violation of the First Amendment under either conceptualization, amici primarily use the district court's terminology in describing the relevant forum.

purporting to limit (by form or subject matter) the speech of those who reply to his tweets." *Id.*

Moreover, President Trump has actively fostered an environment for debate through his use of the @realDonaldTrump account. Defendant Scavino has held out the @realDonaldTrump account "as a means through which the President 'communicates directly with you, the American people!'" SPA 61–62 (quoting Stip. ¶ 37). "Typically, tweets from @realDonaldTrump generate thousands of replies from members of the public, and some of those replies generate hundreds or thousands of replies in turn," A57 (Stip. ¶ 41); "[h]is tweets frequently receive 15,000–20,000 retweets or more," A58 (Stip. ¶ 42); and it is common for his tweets "to approach 100,000 likes," *id.* These responses are not the end of the conversation. Rather, President Trump frequently has tweeted in response to replies to his prior tweets, to replies to other users' tweets, and even to other users' tweets that do not mention @realDonaldTrump. He also has retweeted other users' tweets, whether or not those were replies to @realDonaldTrump tweets, and whether or not they mentioned @realDonaldTrump.[4] In this way, defendants' use of the

---

[4] A brief review of the @realDonaldTrump Twitter feed offers examples of each of these categories of responses to others' commentary. *See, e.g.*, https://twitter.com/realDonaldTrump/status/1044627015662538752 (Sept. 25, 2018) (responding to a flattering comment referring to @realDonaldTrump); https://twitter.com/realDonaldTrump/status/1023536822901776384 (July 29, 2018) (responding to a tweet that did not mention @realDonaldTrump); https://twitter.com/realDonaldTrump/status/966118856874971138 (Feb. 20, 2018) (thanking another user for a positive reply to @realDonaldTrump).

10

@realDonaldTrump account is not one-way government speech, but is more akin to a robust discussion at a town hall meeting.[5]

Given these attributes, it is plain that defendants created a public forum. To be sure, defendants were not required to create the forum in the first place. But by their words and actions, defendants designated the interactive spaces created by @realDonaldTrump tweets as channels of multi-dimensional communication "open for use by the general public." *Perry*, 460 U.S. at 47. Viewpoint-neutral access to interactive spaces of the @realDonaldTrump account is compatible with the forum's intended purpose, as Twitter users understand that one of the site's principal purposes is to promote the free exchange of ideas—a feature the Supreme Court has found important in identifying public fora. *See Forbes*, 523 U.S. at 673; *ISKCON*, 505 U.S. at 679. Put simply, when a government official decides to open the interactive spaces of his Twitter account for conversation among all comers, as defendants did here, a public forum is created. *See Davison v. Loudoun County Bd. of Supervisors*, 267 F. Supp. 3d

---

[5] As amicus Internet Association notes, most social media accounts do not qualify as public fora because they are neither controlled nor operated by governmental actors. *See* Br. of Amicus Curiae Internet Ass'n in Support of Neither Party 3. Moreover, public officials may use social media in their personal capacities, and the First Amendment would not limit officials' actions on their genuinely personal accounts. But here, the district court correctly concluded that, because "the President presents the @realDonaldTrump account as being a presidential account as opposed to a personal account and . . . uses the account to take actions that can be taken only by the President as President," the control he and Defendant Scavino exercise over the account is governmental in nature, not personal. SPA 44–45. Defendants' actions are therefore subject to analysis under the First Amendment.

702, 716 (E.D. Va. 2017), *appeal argued*, No. 17-2002 (4th Cir. Sept. 26, 2018) (concluding that a local official created a public forum when she solicited comments from her constituents and "allowed virtually unfettered discussion" on her Facebook page); *cf. Page v. Lexington County Sch. Dist. One*, 531 F.3d 275, 284 (4th Cir. 2008) (suggesting that a government website that includes "a type of 'chat room' or 'bulletin board' in which private viewers could express opinions or post information" would qualify as a public forum).

Supreme Court precedent makes clear that, contrary to appellants' position, the @realDonaldTrump account does not fall outside the public forum doctrine simply because the government does not formally own the page and did not design the digital environment and tools that allow Twitter pages to function as a modern public square. *See Packingham*, 137 S. Ct. at 1737. Government officials cannot avoid the First Amendment's requirements by renting a space suitable to hold public meetings, rather than hosting meetings in government-owned property. *See Conrad*, 420 U.S. at 547, 555 (privately owned theater under long-term lease to a city was a public forum); *Cornelius*, 473 U.S. at 801 (forum analysis applies to "public property or to private property dedicated to public use"). Here, as the district court noted, President Trump affirmatively chose to utilize Twitter's speech-enhancing features to create a forum for interacting with "the American people." *See* SPA 61–62 (quoting Stip. ¶ 37). And, importantly, defendants—the President and a White House employee—are the exclusive administrators of the @realDonaldTrump account. They, not Twitter,

blocked the individual plaintiffs and thereby exercised effective control over who may

participate in the interactive space associated with tweets sent by the

@realDonaldTrump account. *See* SPA 42–43.[6]

Defendants also argue that, to the extent defendants' use of the

@realDonaldTrump account is governmental in nature, their actions are "government

speech" to which the First Amendment does not apply. *See* Appellants' Br. 31. Yet

the government speech label applies only to President Trump's own statements on

Twitter, not to comments made by private persons interacting in the forum

defendants created on the @realDonaldTrump account. In contrast to true

government speech, no one could possibly confuse the private individuals' comments

as conveying a message from the government, associate that commentary with the

government, or assume the government maintains "control over the messages

conveyed" by other users. *Walker*, 135 S. Ct. at 2248–49; *see also* SPA 55–56 (rejecting

application of the government-speech doctrine to other users' comments). *Cf. Matal

v. Tam*, 137 S. Ct. 1744, 1760 (2017) ("Holding that the registration of a trademark

converts the mark into government speech would constitute a huge and dangerous

extension of the government-speech doctrine."). Rather, as the Supreme Court has

recognized, when "private parties, and not only the government, use[ a] system to

---

[6] Amici adopt the parties' convention of distinguishing between the seven "individual plaintiffs," whom President Trump blocked based on their criticisms, and the Knight First Amendment Institute at Columbia University, which has not been blocked.

communicate," forum analysis—and not the government speech doctrine—is the appropriate lens through which to analyze the case. *Walker*, 135 S. Ct. at 2252. Where, as here, private speech is truly at issue, the government speech doctrine should "not be used as a subterfuge for favoring certain private speakers over others based on viewpoint." *Summum*, 555 U.S. at 473.[7]

Most fundamentally, motivating many of the Supreme Court's decisions in government speech cases is a concern that demanding open access by the public ultimately would be more speech-restrictive because it would lead the government to close the venue entirely. *See, e.g.*, *Summum*, 555 U.S. at 480 ("[W]here the application of forum analysis would lead almost inexorably to closing of the forum, it is obvious that forum analysis is out of place."); *cf. Forbes*, 523 U.S. at 680–81 (finding a nonpublic forum where wholly open access could "result in less speech, not more").

---

[7] In *Morgan v. Bevin*, 298 F. Supp. 3d 1003 (E.D. Ky. 2018), the district court concluded that Kentucky's governor did not violate the First Amendment when he banned critics from commenting on his official social media pages. The court reasoned that the pages, in their entirety, qualified as Governor Bevin's own speech. In particular, the court was of the view that users will assume messages "com[e] from" the Governor if they "appear on" or are "connected to" his pages, even when the messages are posted by people other than the Governor. *Id.* at 1012. The district court's conclusion is mistaken. As laid out above, comments from other users, posted under their own names in the social media context, cannot reasonably be viewed as messages from the government or associated with the government, or as something over which the government maintains control. *See Leuthy v. LePage*, No. 1:17-cv-00296-JAW, 2018 WL 4134628, at *15–16 (D. Me. Aug. 29, 2018) (rejecting *Morgan*'s reasoning).

14

Here, forbidding the President from blocking people from his official Twitter account is the more speech-enhancing course. To an even greater extent than with a physical forum, the interactive spaces on a government official's Twitter account are "capable of accommodating a large number of public speakers without defeating the essential function of . . . the program." *Summum*, 555 U.S. at 478. Moreover, as noted above, the broad access and public interactions Twitter enables are why President Trump—and so many other public officials—choose to use it. Given his millions of Twitter followers and the value that President Trump himself has placed on his ability to interact directly with the public, it is highly unlikely that defendants would shut down the forum entirely over the inability to block those who disagree with the President.[8] There is therefore no inherent incompatibility between the government activity at issue—maintaining and controlling access to the @realDonaldTrump account—and the provision of viewpoint-neutral access to anyone who wishes to participate in the conversation.

---

[8] Indeed, in response to the district court's order, defendants unblocked the individual plaintiffs and a number of other Twitter users who had been blocked because they criticized the President or his policies. *See* Letter from Counsel for Appellees to Counsel for Appellants (Sept. 12, 2018), *available at* https://knightcolumbia.org/sites/default/files/content/Additional_Blocked_Users_ Letter_9_12_18.pdf. That the President continues to tweet regularly using his @realDonaldTrump account—and that many Twitter users continue to participate in conversations responding to the President's tweets—demonstrates that the purpose of the forum is not defeated by the requirement of viewpoint neutrality.

## II. President Trump Engaged in Unconstitutional Viewpoint Discrimination When He Blocked the Individual Plaintiffs Because of Their Criticisms of Him and His Policies.

### A. The First Amendment Prohibits Public Officials from Censoring Speech Because of Its Political Viewpoint.

No principle could be more plain or more fundamental than that the "government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 96 (1972). In this instance, President Trump did precisely that by blocking the individual plaintiffs from the interactive spaces of the @realDonaldTrump account. In a forum of any kind, the President's censorship of speech because of the political viewpoint expressed is prohibited. *See, e.g.*, *Perry*, 460 U.S. at 46.

On appeal, defendants do not disagree with the district court's conclusion that "the individual plaintiffs were indisputably blocked as a result of viewpoint discrimination." SPA 63. This conclusion is clearly correct. In their stipulation of facts before the district court, defendants did not contest that "the Individual Plaintiffs were blocked from the President's Twitter account because the Individual Plaintiffs posted tweets that criticized the President or his policies." *Id.* (quoting Stip. at 1). Prohibiting users from exercising the full breadth of their free speech rights because of their opposition to the President or his policies is "the quintessential form

16

of viewpoint discrimination against which the First Amendment guards." *Davison*, 267 F. Supp. 3d at 717.

The President's actions are particularly concerning because speech on matters of public concern lies "at the heart of the First Amendment's protection."' *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758–59 (1985) (plurality op.) (quoting *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 776 (1978)). The First Amendment's bar against censorship of critical views effectuates "our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.'" *Garrison v. Louisiana*, 379 U.S. 64, 75 (1964) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). The First Amendment therefore bars defendants from excluding the individual plaintiffs from a public forum because the President disliked their criticism.

Prohibiting viewpoint discrimination of the kind the President engaged in here recognizes that such behavior harms the blocked individual in a number of ways. First, a blocked user may not view the President's tweets from her blocked account, and the user may not directly reply to an @realDonaldTrump tweet. The blocked user is thereby excluded from participating in the public discourse occurring on the @realDonaldTrump account in an important way. Given the number of Twitter users commenting and following the debate occurring there, the @realDonaldTrump

17

account is a critical venue for speech and debate. Such an exclusion is "akin to banishing a citizen from making his views known in city hall, but instead on a street corner outside the building." *Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 339 (1st Cir. 2009) (Torruella, J., concurring in part and dissenting in part).

The individual plaintiffs' capacity to express their views elsewhere does not alleviate the injury they have suffered. "If restrictions on access to a . . . public forum are viewpoint discriminatory, the ability of a group to exist outside the forum would not cure the constitutional shortcoming." *Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 561 U.S. 661, 690 (2010); *see also Reno*, 521 U.S. at 879–80 (rejecting the suggestion that a speaker's ability to post content elsewhere on the Internet would cure a content-based restriction). What is more, knowing that President Trump may block users in response to their critical comments may well lead other users to self-censor in order to avoid exclusion from the public debate.

Second, blocked users cannot follow a blocking user, so blocked users cannot see President Trump's tweets in real time—whether through "push" notifications or by scrolling through their own feeds—which may delay their ability to access the President's statements. A52 (Stip. ¶ 28). In the context of the rapid interactions that occur over Twitter and other social media, the denial of such instant notification may impede users' efforts to participate in and shape the public dialogue on a given issue. *Cf. Reno*, 521 U.S. at 870 (emphasizing the ability to engage in "interactive, real-time dialogue" as a reason that online speech merits broad First Amendment protection).

18

Third, blocked Twitter users cannot retweet @realDonaldTrump tweets to their own hard-won Twitter audiences. Blocked users are precluded from sharing their interpretations of the President's words, juxtaposed with the President's underlying messages, with their follower bases. Nor can they retweet older @realDonaldTrump tweets to expose perceived inconsistencies between his current and former public statements. Both the blocked users and the broader public suffer from this distortion in the marketplace of ideas.

Defendants do not dispute that the President's blocking of the individual plaintiffs diminishes their opportunity to be heard. Rather, defendants contend that the President is entitled to choose to whom he listens and whose voice he amplifies. Appellants' Br. 34–38. To be sure, the First Amendment does not limit the President's right to retweet comments made by those users with whom he agrees or to respond only to those comments and not to others. And the President may be able to "mute" another user, making that user's tweets, replies, and notifications invisible to the muting user, but leaving that commentary visible to others who view the @realDonaldTrump timeline. *See How to Mute Accounts on Twitter*, Twitter, https://support.twitter.com/articles/20171399. But, as the district court recognized, "when the government goes beyond merely amplifying certain speakers' voices and not engaging with others, and actively restricts 'the right of an individual to speak freely [and] to advocate ideas,' it treads into territory proscribed by the First

Amendment." SPA 65 (quoting *Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 286 (1984)).

What makes the President's decision to block the individual plaintiffs constitutionally problematic is that blocking imposes viewpoint-based burdens on the blocked users' participation in the broader public forum created on the @realDonaldTrump account and on other users' access to their commentary. Defendants are simply incorrect that "the only material impact that blocking has on the individual plaintiffs' ability to express themselves on Twitter is that it prevents them from speaking directly to Donald Trump." Appellant's Br. 35. As the district court explained, "[w]hile the right to speak and the right to be heard may be functionally identical if the speech is directed at only one listener, they are not when there is more than one." SPA 67.

Moreover, applying established First Amendment principles to social media fully preserves the ability of public officials to control their own speech and deter legitimate abuses of their social media pages. To the extent that a public official participates in social media in a genuinely personal capacity (unlike here), the First Amendment does not apply to his or her conduct. And, consistent with the First Amendment, public officials may subject public-speech platforms to reasonable, viewpoint-neutral regulations in order to foster a healthy and robust exchange of ideas. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (allowing time, place, and manner restrictions in public fora). The government is fully capable of applying

the principles underlying such regulations to social media, just as it has long applied those principles to physical spaces. Defendants' fears of encroachments on the President's First Amendment rights are therefore overstated.

### B. Permitting the President to Selectively Blocks Critics from His Twitter Account Can Mislead the Public and Distort Public Dialogue.

Twitter has changed where political discourse occurs in this country, as has the President's innovative use of that medium. But the use of new technology has not altered the principle that, where the government opens a space to an exchange of views by members of the general public, a public forum exists and the government may not discriminate based on viewpoint. Maintaining fidelity to these well-established First Amendment principles will go a long way toward preventing modern venues like Twitter from being exploited by government officials to mislead the public and distort public dialogue.[9]

It is axiomatic that free expression and the debate it facilitates are at the heart of democratic self-governance. That debate often occurs in government-generated public fora:

> In addition to furthering the First Amendment rights of individuals, the use of government property for expressive activity helps further the interests that freedom of speech serves for society as a whole:

---

[9] Defendants' viewpoint discrimination also implicates the right of citizens to petition the government for redress of their grievances. The First Amendment's Petition Clause guarantees the right to speak to those empowered to take action in response, thereby promoting governmental accountability to the electorate. *See* Lyrissa Lidsky, *Public Forum 2.0*, 91 B.U. L. Rev. 1975, 2009–10 (2011).

it allows the "uninhibited, robust, and wide-open" debate about matters of public importance that secures an informed citizenry, *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964); it permits "the continued building of our politics and culture," *Police Department of Chicago v. Mosley*, 408 U.S. 92, 95–96 (1972); it facilitates political and societal changes through peaceful and lawful means, see *Carey v. Brown*, 447 U.S. 455, 467 (1980); and it helps to ensure that government is "responsive to the will of the people," *Stromberg v. California*, 283 U.S. 359, 369 (1931).

*Cornelius*, 473 U.S. at 815–16 (Blackmun, J., dissenting). The opportunity to hear from a variety of perspectives is particularly crucial to our democratic strength, because the First Amendment "rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public." *Associated Press v. United States*, 326 U.S. 1, 20 (1945).

The selective blocking of social media users based on viewpoint is particularly problematic given the increasingly important role of social media to public debate and dialogue on issues of public governance. Today, social media users expect to follow and generally be able to participate in political discussions online, and public officials at all levels of government use social media sites as critical tools of communication, response, and debate.[10] Because the @realDonaldTrump Twitter account is open to the public and the comment threads are generally available for any Twitter user to

---

[10] According to a 2016 poll, approximately one third of social media users often or sometimes discuss government and politics on social media. Maeve Duggan & Aaron Smith, Pew Research Ctr., *The Political Environment on Social Media* 7 (Oct. 25, 2016), http://assets.pewresearch.org/wp-content/uploads/sites/14/2016/10/24160747/ PI_2016.10.25_Politics-and-Social-Media_FINAL.pdf.

comment (unless blocked), members of the public naturally would conclude that the exchanges they observe there represent uncensored conversations reflecting the range of opinions among those who engage on Twitter. That quite reasonable conclusion would be deeply mistaken, however, if a public official could skew the balance of the commentary by excluding or hindering critics from speaking in a forum that the official holds out as open to all. It is crucial that courts do not allow politicians to censor comments they do not like and thereby skew their constituents' perceptions of the debates unfolding in the public eye. *See Madison Joint Sch. Dist. No. 8 v. Wis. Emp't Relations Comm'n*, 429 U.S. 167, 175–76 (1976) (expressing concern about the government allowing "one side of a debatable public question to have a monopoly in expressing its views").

The dangers of viewpoint censorship are exacerbated when the government itself speaks while silencing those who disagree with it. Government speech on its own is often beneficial—offering information about governmental decisions, for example, or promoting behaviors policymakers have deemed beneficial. But when the government pairs its advocacy of a particular position with restrictions on dissent, the mechanisms of democratic accountability that regulate government speech are undermined. *See* Helen Norton, *Government Speech and the War on Terror*, 86 Fordham L. Rev. 543, 547 (2017) (noting that Federalist exaggeration of the danger of war with France led to acts of violence against those perceived to be disloyal and the suppression of speech through the Alien and Sedition Acts); *cf. Walker*, 135 S. Ct. at

23

2245 ("[I]t is the democratic electoral process that first and foremost provides a check on government speech.").

Although this President may be the first to rely so heavily on Twitter for engaging directly with the public, he will not be the last. Already, other American political figures have begun experimenting with banning dissent and opposition from their social media pages. *See, e.g.*, *Leuthy v. LePage*, No. 1:17-cv-00296-JAW, 2018 WL 4134628 (D. Me. Aug. 29, 2018) (Governor of Maine); *Morgan v. Bevin*, 298 F. Supp. 3d 1003 (E.D. Ky. 2018) (Governor of Kentucky); *Davison*, 267 F. Supp. 3d 702 (Chair of Loudoun County, Virginia, Board of Supervisors); Erik Ortiz, *Maryland Governor Settles Lawsuit with ACLU over Facebook Censorship*, NBC News, Apr. 3, 2018, https://www.nbcnews.com/politics/politics-news/maryland-governor-settles-lawsuit-aclu-over-facebook-censorship-n862461. Left undisturbed, defendants' innovative approach to censoring critics could lead more officials at all levels of government to seek the type of curated approval in which healthy democratic dialogue dwindles.

The practices of modern authoritarian regimes highlight the dangers social media censorship poses to democratic norms. Governments in countries such as China, North Korea, and Russia use social media to "reinforce regime legitimacy through careful management of online discourse" by "sidelin[ing] or discredit[ing] anti-regime sentiment, while at the same time mobilizing the regime's own supporters." Seva Gunitsky, *Corrupting the Cyber-Commons: Social Media as a Tool of*

24

*Autocratic Stability*, Perspectives on Politics, Mar. 2015, at 42, 45.  Efforts at censorship also may take advantage of "emerging techniques of speech control" to undermine dissent, such as "unleashing 'troll armies' to abuse the press and other critics" or "flooding" social media with false information and propaganda to drown out disfavored speech.  Tim Wu, *Is the First Amendment Obsolete?*, Knight First Amendment Inst., Emerging Threats at 2 (Sept. 2017), https://knightcolumbia.org/content/tim-wu-first-amendment-obsolete.  In all of these ways, authoritarian regimes are able to cultivate a false impression that political leaders are supported by the public, thereby warping people's understanding of how those leaders are *really* viewed by others and aiding those regimes' efforts to quash democratic impulses.

Although blocking the Twitter accounts of those who criticize the President does not approach the extreme practices of authoritarian regimes, such real-world exploitation of social media is instructive of what can happen absent meaningful restraints on political leaders.  It is thus imperative that the First Amendment remain a bulwark against any governmental impulse to "silence dissent," "distort the marketplace of ideas," and "remove certain ideas or perspectives from a broader debate."  *Matal*, 137 S. Ct. at 1766–67 (Kennedy, J., concurring in part and concurring in the judgment).

## CONCLUSION

For these reasons, the district court correctly concluded that the interactive space on the @realDonaldTrump Twitter account is a public forum, and that defendants violated plaintiffs' First Amendment rights by excluding the individual plaintiffs from that forum on the basis of the viewpoints they expressed.

Dated: October 18, 2018                    Respectfully Submitted,

*/s/ Amy L. Marshak*
Amy L. Marshak
Joshua A. Geltzer
Mary B. McCord
INSTITUTE FOR CONSTITUTIONAL
  ADVOCACY AND PROTECTION
GEORGETOWN UNIV. LAW CENTER
600 New Jersey Ave. N.W.
Washington, DC 20001
(202) 662-9042

*Counsel for Amici Curiae*

# APPENDIX†

## List of Amici Curiae

Ashutosh Bhagwat, Martin Luther King, Jr. Professor of Law, UC Davis School of Law

Erwin Chemerinsky, Dean and Jesse H. Choper Distinguished Professor of Law, Berkeley Law

Genevieve Lakier, Assistant Professor of Law, University of Chicago Law School

Lyrissa Lidsky, Dean and Judge C.A. Leedy Professor of Law, University of Missouri School of Law

Helen Norton, Professor and Ira C. Rothgerber, Jr. Chair in Constitutional Law, University of Colorado School of Law

Amanda Shanor, Assistant Professor, University of Pennsylvania Wharton School

Geoffrey R. Stone, Edward H. Levi Distinguished Service Professor of Law, The University of Chicago

Laurence H. Tribe, Carl M. Loeb University Professor and Professor of Constitutional Law, Harvard Law School

Rebecca Tushnet, Frank Stanton Professor of First Amendment Law, Harvard Law School

---

† Institutional affiliations are listed for identification purposes only. The opinions expressed are those of individual amici and do not represent the views of their affiliated institutions.

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation in Rule 29(d) and 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 6,480 words, excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in Microsoft Word 2016, using Garamond, a proportionately spaced typeface, in 14-point font.

*/s/ Amy L. Marshak*
Amy L. Marshak

# CERTIFICATE OF SERVICE

I certify that on this 18th day of October, the foregoing brief was served on all parties or their counsel of record through the CM/ECF system. All parties are appellate ECF filing users and will receive service via the appellate CM/ECF system.

/s/ *Amy L. Marshak*
Amy L. Marshak